**Peter PROBST, Plaintiff,**

v.

**Janet RENO, Attorney General of the United States, and Thomas A. Constantine, Administrator of the Drug Enforcement Administration, Defendants.**

**No. 94 C 691.**

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 22, 1995.

---

Jonathan B. Gilbert, David Philip Schippers, James M. Bailey, Schippers, Gilbert & Bailey, Chrtd., Chicago, IL, for plaintiff.

Monica Rimai, United States Attorney's Office, Eastern District of Wisconsin, Milwaukee, WI, Pamela J. Auerbach, United States Department of Justice, Washington, DC, Mark T. Quinlivan, United States Department of Justice, Civil Division, Washington, DC, for Janet Reno.

Monica Rimai, United States Attorney's Office, Eastern District of Wisconsin, Milwaukee, WI, Pamela J. Auerbach, United States Department of Justice, Washington, DC, for Stephen H. Greene and Thomas A. Constantine.

*MEMORANDUM OPINION
AND ORDER*

HOLDERMAN, District Judge:

Plaintiff Peter Probst is a veteran U.S. Drug Enforcement Administration (DEA) special agent. His race is white. He filed this action against his superiors for employment discrimination and retaliation. The jurisdiction of the court is invoked under 42 U.S.C. § 2000e–16 and 42 U.S.C. § 2000e–5(f)(3). Defendants dispute the court's subject matter jurisdiction only as to plaintiff's claim for damages arising from loss of promotions.

Counsel for the parties resolved a substantial number of issues before trial and waived the demand for a trial by jury. On December 14 and 15, 1995 the remaining issues in the case were tried in a bench trial to the court.

*BACKGROUND*

In preparation for the trial, counsel for the parties submitted a proposed final pretrial order pursuant to Local General Rule 5.00. That final pretrial order was entered as proposed the day the trial began. Among the sections of that December 14, 1995 final pretrial order was a section stating the agreement of the parties as to the undisputed material facts [1] as follows:

*UNDISPUTED MATERIAL FACTS*

1. Plaintiff Peter Probst is employed by the Drug Enforcement Administration as a criminal investigator (DEA), and has been so employed since September of 1983. In June, 1984, plaintiff was transferred to the Chicago Field Division of the DEA, and a year or two later began to work with what is now Group 12 of the Chicago Field Division. As of July 1, 1991, Mr. Probst was transferred from Group 12 to become the Divisional Cannabis Eradication Coordinator for the Chicago Division.

---

1. In presenting the undisputed facts in the final pretrial order, counsel for the parties used various letter abbreviations that are common in law enforcement parlance. The court has adopted the same designations and made clarifications in this opinion when appropriate for consistency.

2. Mr. Probst has been married to Vilija A. Bilaisis since March, 1991. Ms. Bilaisis is employed as an Assistant U.S. Attorney [AUSA], and has been so employed since December, 1985.

3. From September, 1990 through August, 1995, James A. Woolley was the Group Supervisor [G/S] of Group 12 in the Chicago Field Office of the DEA.

4. From October 1990 through May 17, 1995, Joseph A. Vanacora was the Associate Special Agent in Charge (ASAC) of the Chicago Field Division of the DEA.

5. During 1991, 1992, and 1993, Armando Marin, Alejandro Duran, and Edward McKulsky were employed as Inspectors in the Office of Professional Responsibility (OPR) of the DEA.

6. During 1990 and 1991, a crack cocaine investigation, commonly known as the Claiborne investigation, was ongoing. [Special Agent] S/A Probst was the case agent and team leader, and Special Agents Michael Kress and John Wooten were the other team members with S/A Probst. S/A Kress was later replaced by S/A Thomas Evans. Only S/A Wooten is African–American.

7. AUSA Bilaisis was also working on the Claiborne investigation, as was Sgt. James Brady of the Chicago Police Department and S/A Kevin Moss of the Internal Revenue Service. A wiretap pursuant to Title III was planned in the spring of 1991 as a part of the Claiborne investigation.

8. Both prior to and during the course of the wiretap S/A Peter Probst complained to Group Supervisor Woolley about the performance of other agents. G/S Woolley discussed S/A Probst's complaints with these individual agents.

9. During the course of the wiretap, S/A Peter Probst informed Group Supervisor Woolley that he was receiving late night telephone calls at his house, in which the caller hung up.

10. In late June, 1991, S/A Probst reported alleged incidents of racial discrimination against S/A Wooten to EEO Counsellor Valerie Turner.

11. As of July 1, 1991, S/A Probst was no longer working with S/A Wooten, no longer in Group 12, and G/S James Woolley was no longer his supervisor. S/A Probst's first line supervisor was now ASAC Saul Weinstein.

12. On August 4, 1991, S/A Probst contacted EEO Counsellor Alex Rodriguez. Within the next 21–day period, in accordance with applicable rules, Rodriquez contacted DEA management of the Chicago Field Division in an effort to resolve Probst's complaint.

13. On August 29, 1991, S/A Probst met with SAC Cloud regarding his EEO complaint. On August 30, 1991, S/A Probst gave SAC Cloud a memorandum listing a chronology of the alleged events that had occurred.

14. G/S Woolley gave S/A Probst a projected overall rating of outstanding in the January, 1991 mid-year review.

[No paragraph number 15 was submitted.]

16. Some time after June 17, 1991, G/S Woolley hand wrote a draft justification for giving Probst an outstanding rating for the year ending June 30, 1991. In this document Woolley refers to the Claiborne indictment that was returned on June 13, 1991, arrests and seizures made on June 14, 1991, and seized money counted on June 17, 1991.

17. When S/A Probst received his evaluation for the period July 1, 1990 through June 30, 1991 from G/S Woolley on August 27, 1991, G/S Woolley rated Probst as excellent. Vanacora had approved this rating. On September 16, 1991, Probst appealed to the Performance Rating Grievance Committee on the basis that the individual items within Critical Element # 2 that had been rated low were internally inconsistent with the rest of the ratings in this evaluation. On November 29, 1991, the Performance Rating Grievance Committee raised the evaluation to outstanding.

18. G/S Woolley had rated Probst as "seldom" asking for help regarding the Claiborne case and never seeking the input of other senior agents to better understand the case situation. This resulted in an

overall rating of "excellent" rather than "outstanding". G/S Woolley did not and could not consider inter-personal skills. Vanacora agreed with the evaluation.

19. Neither the evaluation that Woolley tendered to Probst nor Woolley's response memorandum dated September 6, 1991, to Probst's appeal of Woolley's evaluation mentioned any acts of insubordination or disrespectful conduct.

20. SAC Cloud requested that OPR conduct an independent investigation into the various allegations because some of the allegations involved DEA management in the Chicago Field Division.

21. Beginning on or about November 25, 1991, and continuing until on or about April 6, 1992, DEA OPR Inspectors Marin, Duran, and McKulsky conducted an investigation into the allegations made against S/A Probst.

22. Douglas A. Ross was the Chairman of the Board of Professional Conduct in DEA in 1992, and was the Proposing Official in the suspension action taken against S/A Probst.

23. William P. McMullan, who served as the Supervisory Criminal Investigator in the Operations Support Division of the DEA from September 1992 through February 1994, was the Deciding Official in the suspension action taken against S/A Probst.

24. During the Claiborne investigation, S/A Probst was selected for the position of Divisional Cannabis Eradication Coordinator. One of the requirements for that job is to "be able to deal effectively with high level officials of other organizations and to effectively build relationships conducive to intensified drug enforcement efforts."

25. In 1992, DEA instituted its Special Agent Promotion Program (SAPP). Under the SAPP, the agency formally evaluates the promotion potential of all grade 13 and 14 Special Agents who wish to be promoted. The evaluation consists of two parts: standardized tests conducted at the "assessment center," and supervisory evaluations, each of which counts for 50% of the agent's overall score.

26. In March, 1992, S/A Probst attended the assessment center and scored 48 out of 50 points. His supervisor, then-ASAC Weinstein, gave him 38 out of a possible 50 points.

On the day of the scheduled final pretrial conference, December 12, 1995, after counsel for the parties had submitted the proposed final pretrial order to the court, counsel announced to the court·off-the-record that a further agreement had been reached as to aspects of this litigation. One aspect, counsel informed the court, that remained in dispute was the amount, if any, of compensatory damages suffered by the plaintiff. The court requested the parties to reduce their agreement to writing. That written agreement was prepared. It was submitted to the court before the trial started on December 14, 1995 and signed by counsel. That agreement was accepted by the court as a further statement of the parties as to additional facts presented to resolve certain previously disputed issues and as to the parties' agreement regarding the application of the law to those facts and issues.

That document which was entitled "Agreement" (hereinafter referred to as "the December 14 Agreement") stated as follows:

### AGREEMENT

This Agreement is made by and on behalf of Peter Probst ("Plaintiff" herein); and Janet Reno, Attorney General of the United States, and Thomas Constantine, Administrator, Drug Enforcement Administration ("Defendants" herein), (collectively "the parties"), in the above-captioned action, by and through the parties' undersigned attorneys.

WHEREAS, plaintiff has asserted claims against defendants pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.,* and

WHEREAS, the parties desire to reach an agreement of their differences, it is hereby agreed that this case is settled on the following terms:

1. Defendants agree to rescind the ten-day suspension of plaintiff, issued in May 1993, and expunge any and all references

to this suspension from plaintiff's official personnel file.

2. Defendants agree to pay plaintiff the sum of $2,229.02 which constitutes the amount of pay net lost by plaintiff during the ten-day suspension referenced in paragraph 1.

3. Defendants agree to restore *[blank]* hours of annual leave and *[blank]* hours of sick leave to plaintiff, attributable to leave taken on account of this case, to be determined from official records.

4. Defendants agree to pay plaintiff's reasonable attorney fees and costs incurred in connection with this case. The defendants' payment shall constitute full accord and satisfaction of all attorney fees and expenses incurred in this action, in the processing of plaintiff's EEO complaints, and in any other claims or potential claims against defendants for which advice or legal services were provided.

5. The parties agree that neither this Agreement, nor any negotiations or proceedings in connection herewith, shall in any manner constitute, or be construed to constitute, as admission on the part of defendants of a violation of Title VII of the Civil Rights act, or a violation of law whatever, whether as alleged in this litigation or otherwise.

6. Consistent with its obligation under Title VII of the Civil Rights Act, defendants agree not to engage in, or allow any of their employees to engage in, conduct of a retaliatory or reprisal nature, as prohibited by Title VII, against any individual associated with this lawsuit.

7. The parties have not reached an agreement on the amount of compensatory damages, and the issue of loss of promotions, available to plaintiff in this case. The parties agree to submit the issues of plaintiff's entitlement to compensatory damages and promotion pay under the Civil Rights Act of 1991, 42 U.S.C. § 1981a, to the Court for determination.

8. The parties agree that they will be bound by the Court's determination of plaintiff's entitlement, if any, to compensatory damages and pay for lost promotion under the Civil Rights Act of 1991, 42 U.S.C. § 1981a, subject to the parties' rights to appeal.

9. This Agreement shall become effective upon the signature of counsel for all parties. Upon becoming effective, defendants will take the actions set forth in paragraphs 1–4 of this Agreement.

10. The parties agree that this Agreement may be used as evidence in any subsequent proceeding in which either party alleges a breach of this Agreement.

11. The terms of the numbered paragraphs of this Agreement constitute the entire agreement of the parties, and no prior statement, representation, agreement, or understanding, oral or written, which is not contained herein, shall have any force or effect, nor does the Agreement reflect any agreed-upon purpose other than the desire of the parties to settle this action without the time and expense of further litigation. This Agreement shall be deemed to have been jointly drafted by all parties and no alleged ambiguity shall be construed against any party as the drafter.

12. The plaintiff agrees to release and forever discharge the defendants, and any and all of its current or former officers, employees, agents, successors, or assigns from any and all liability for any and all claims, complaints, grievances, or other causes of action which were or could have been raised on or before the effective date of this Agreement on any claims cognizable under any law or regulation.

To ensure that the court understood the parameters of the parties' agreements and so the court could ensure inapplicability of Federal Rule of Evidence 408 to the December 14 Agreement, that had been submitted to the court unsigned by counsel bearing the title "Settlement Agreement", the court inquired of counsel on December 14, 1995 before the bench trial started as to the agreed pretrial resolution of the issues set forth in "Agreed Statement of the Issues of Fact and Law" section of the final pretrial order. Counsel for the parties agreed that the court should accept, in deciding the remaining disputed issues, that the proper answers to the questions presented by issues 1 through 8

was "Yes".[2] The parties also agreed that the proper interpretation of issues 9, 11 and 12 (there being no issue number 10 presented) was that the defendants' reasons were "pretextual"[3]. Counsel for the parties also stated they had agreed that issues 13, 14, 15 and 18 were properly answered "Yes".[4] With the statement of those agreements the court proceeded to conduct the bench trial on December 14 and 15, 1995 of the issues that remained in dispute which were as follows: part of issue 15[5] plus issues 16, 17 and 19[6] of the final pretrial order's "Agreed Statement of the Issues of Fact and Law."

## DISCUSSION

Racial discrimination among the ranks of law enforcement personnel is abhorrent and contrary to the principles of justice. It is not only inappropriate, it is intolerable. When, in June 1991, plaintiff, Peter Probst, a veteran law enforcement officer and veteran DEA special agent, determined that racial discrimination by DEA personnel had precipitated the law enforcement problems attendant to the major DEA criminal investigation into crack cocaine distribution in the Chicagoland area, labelled "the Claiborne investigation" of which S/A Probst was the case agent and team leader, Probst spoke out. He spoke out appropriately and laudably. Contrary to what S/A Probst expected would be the response of his immediate supervisors, DEA Group Supervisor (G/S) James A. Woolley, and the Associate Special Agent in Charge (ASAC) of the Chicago Field Office of DEA,

2. Issues 1 through 8 were stated in the final pretrial order as follows:

1. Whether the Plaintiff was subjected to harassment which created a hostile work environment within the meaning of *Parr v. Woodmen of the World Life Insurance Co.*, 791 F.2d 888 (11th Cir.1986).
2. Whether of the Plaintiff has the right to work in an environment free of racial discrimination.
3. Whether the Plaintiff's working environment during the Claiborne investigation was permeated by racial discrimination.
4. Whether the Plaintiff had reasonable belief that the practices he was challenging violated Title VII.
5. Whether, in challenging these practices, the Plaintiff engaged in statutorily protected expression.
6. Whether the plaintiff suffered an adverse action by his employer.
7. Whether there is a causal link between the protected expression and the adverse action.
8. Whether the timing of the adverse actions taken by the Defendants against the Plaintiff supports the inference of a causal link between the adverse action and the protected expression.

3. Issues 9, 11 and 12 were stated in the final pretrial order as follows:

9. Whether the Defendants' reasons for beginning an investigation of Plaintiff by management were legitimate or pretextual.
11. Whether the Defendants' reasons for initiating an OPR investigation of the Plaintiff were legitimate or pretextual.
12. Whether the Defendants' reasons for suspending the Plaintiff were legitimate or pretextual.

4. Issues 13, 14, 15 and 18 were stated in the final pretrial order as follows:

13. Whether the retaliation against the Plaintiff continued after November 21, 1991.
14. Whether the racial discrimination continued after November 21, 1991.
15. Whether the Plaintiff suffered special damages as a consequence of the racial discrimination and retaliation.
18. Whether the Court has subject matter jurisdiction over conduct which occurred before July 1, 1991.

5. The part of issue 15 upon which the court allowed evidence was whether any back pay was due plaintiff resulting from any loss of promotion claimed by plaintiff. Defendant objected to the court's subject matter jurisdiction on this issue. Having reviewed the matter, the defendants' subject matter jurisdiction objection is sustained. The court finds that plaintiff's lack of promotion claim was not sufficiently raised in plaintiff's EEO claims or in the attachments thereto. (PXs 1 and 2.) Even if this court had subject matter jurisdiction on that issue, the evidence presented at the trial does not sufficiently establish that plaintiff took the necessary steps to apply for any promotion in order to be appropriately eligible for a promotion within the procedures of the DEA.

6. Issues 16, 17 and 19 as stated in the final pretrial order were as follows:

16. Whether the Plaintiff suffered physical, emotional and psychological distress for acts after November 21, 1991 for which he is entitled to compensatory damages.
17. Whether the Court has subject matter jurisdiction over Plaintiff's claim for loss of promotions.
19. Whether Plaintiff is entitled to compensatory damages for injuries to him proximately caused by actions allegedly taken against Plaintiff's wife.

Joseph A. Vanacora, it was Probst who thereafter came under criticism for his speaking out against racial discrimination by other DEA personnel. As a result, S/A Probst became, beginning in late December 1991 or early January 1992, the subject of a DEA/OPR investigation. That investigation of plaintiff Probst unfairly persisted throughout the year 1992 and culminated in a letter dated December 22, 1992. The letter was presented to plaintiff Probst in January 1993. It ordered that plaintiff Probst be punished by a suspension without pay from DEA service for a period of ten days. In May 1993 plaintiff served that ten-day suspension from his DEA work and suffered a concomitant loss of income. Paragraphs 1 and 2 of the December 14 Agreement of the parties stated:

> 1. Defendants agree to rescind the ten-day suspension of plaintiff, issued in May 1993, and expunge any and all references to this suspension from plaintiff's official personnel file.
> 2. Defendants agree to pay plaintiff the sum of $2,229.02 which constitutes the amount of pay net lost by plaintiff during the ten-day suspension referenced in paragraph 1.

In light of the agreements as articulated by counsel on the record on December 14, 1995 before the trial began, the court need not discuss in detail the facts proving plaintiff's articulated claims of employment discrimination and intentional unlawful retaliation. Based upon the stipulations and agreements reached by counsel and stated on the record, the elements of plaintiff's claim have been proven, in that:

> "(1) [plaintiff Probst] engaged in statutorily protected expression; (2) [he] suffered an adverse action by [his] employer; and (3) there is a causal link between the protected expression and the adverse action."

*Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1447 (7th Cir.1994). Additionally, defendants' counsel conceded before trial that defendants' stated reasons for their actions against plaintiff Probst were pretextual.

■ The court finds pursuant to the final positions of the parties, the agreements articulated by counsel before trial and the evidence adduced at trial regarding the issues in the case that:

1. Plaintiff Probst was subject to harassment which created a hostile work environment;

2. Plaintiff Probst's working environment during the Claiborne investigation was permeated by racial discrimination;

3. Plaintiff Probst was reasonable in his belief that the practices he was challenging violated Title VII;

4. Plaintiff Probst in challenging these practices was engaged in statutorily protected expression;

5. A causal link exists between plaintiff Probst's protected expression and the adverse action taken against him by defendants;

6. Defendants' reasons for initiating the OPR investigation of plaintiff were pretextual for defendants' retaliation against plaintiff for his protected expression;

7. Defendants' reasons for suspending plaintiff was likewise pretextual for the defendants' retaliation against plaintiff for his protected expression;

8. Defendants' unlawful retaliation against plaintiff continued after November 21, 1991.[7]

9. The racial discrimination continued after November 21, 1991.

10. Plaintiff suffered special damages as a consequence of the racial discrimination and retaliation in which the defendants engaged against plaintiff.

Having made the above-stated findings based upon the pretrial stipulations and agreements articulated by counsel on the

---

7. November 21, 1991 was the effective date of the Civil Rights Act of 1991. It is not retroactive, *Landgraf v. USI Film Products*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) and, therefore, the facts regarding events occurring before November 21, 1991 are relevant only as back- ground. *See Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1349–50 (7th Cir. 1995). The court has considered only events after November 21, 1991 in evaluating the issues left to be decided at the trial in the case.

record, as well as the evidence adduced at the trial, the court will now consider the issues disputed at trial.

I. *Plaintiff's Entitlement to Compensatory Damages for Physical, Emotional and Psychological Distress for Defendants' Acts After November 21, 1991 (Issue No. 16)*

Pursuant to 42 U.S.C. § 1981a(a)(1) plaintiff Probst may recover compensatory damages, subject to the limitation of 42 U.S.C. § 1981a(b)(3)(D),[8] proximately caused to plaintiff by defendants "unlawful intentional discrimination" and retaliation prohibited by 42 U.S.C. § 2000e–2(a)(1); § 2000e–3(a) and § 2000e–16. There is no question based on the preponderance of the evidence that defendants intentionally and unlawfully acted against plaintiff Probst by discriminating and retaliating against plaintiff Probst for his having spoken out against racial discrimination within the ranks of the DEA.

Defendants, using the power of the government, initiated an unfounded retaliatory, biased DEA/OPR investigation of plaintiff Probst on the purported, but pretextual, basis that plaintiff Probst had engaged in misconduct and insubordination. Plaintiff was told by DEA/OPR Inspector McKulsky that he, Probst, could be fired. When plaintiff Probst provided a list of witnesses in his defense, those witnesses were ignored by the DEA/OPR investigators because the stated basis for the investigation was pretextual and the real reason was retaliation for Probst having spoken out against race discrimination in the DEA. Probst knew the investigation was pretextual, but was powerless to do anything about it.

After the biased and unjustified investigation, Probst was suspended for ten days in May of 1993 in retaliation for his lawful expression. His health deteriorated. He would wake up at night and worry. He would do this night after night. He was unable to get back to sleep. He was always tired. He suffered persistent migraine headaches and stomach aches. When he was awake, the unfairness with which he was treated by the defendants obsessed him. He became emotionally upset and depressed. He was anxious about what had been done to him. He was continuously suspicious and fearful about his future. Probst considered his life destroyed.

The devastating, emotional anguish suffered by plaintiff Probst which resulted from the intentional unlawful retaliatory conduct of the defendants persisted in varying degrees of intensity beginning in late 1991, over a period of four years—1992, 1993, 1994 and 1995. There were times plaintiff Probst could not function at work or at home as well as he had before defendants' unlawful actions against him. Additionally, he was afraid that his seeking medical help or ingesting prescribed drugs for the ailments brought on by defendants' conduct would somehow be used against him by the supervisory personnel of the DEA to cause him further difficulties in his position as a DEA special agent.

After listening to plaintiff's testimony and viewing his demeanor, the court finds him credible. The court on the same basis also finds the testimony of plaintiff's wife, Vilija Bilaisis, credible. The court offered defendants' counsel the opportunity to call as witnesses any of the DEA special agents or DEA administrative personnel named by plaintiff Probst and Ms. Bilaisis in their testimony presented at trial. Thus, the defendants were provided the opportunity to rebut that testimony. No such witnesses were called to testify by defendants' counsel.[9]

---

**8.** 42 U.S.C. § 1981a(b)(3)(D) states:

(3) Limitations

The sum of the amount of compensatory damages awarded under this section for future pecuniary loses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—

(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

**9.** The testimony of the two witnesses who were called by defense counsel to testify at the trial related to the issue of plaintiff's claim of lost promotions upon which the court has sustained defendants' objections. *See* footnote 5, *infra.*

█ Since it is the court's obligation as the fact finder to quantify the "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses," 42 U.S.C. § 1981a(b)(3) proven by the evidence that plaintiff sustained as a proximate cause of defendants' intentional unlawful retaliatory conduct committed after November 21, 1991, the court finds that the compensatory damages plaintiff Probst suffered and should recover resulting from the intentional unlawful retaliatory acts taken against him to be $180,000. The court has come to this finding by considering the appropriate compensatory damages reasonably suffered by plaintiff during each calendar year after 1991 as follows:

| | |
|---|---|
| 1992 | $ 85,000 |
| 1993 | 55,000 |
| 1994 | 25,000 |
| 1995 | 15,000 |
| Total | $180,000 |

The court finds that the defendants' intentional unlawful retaliatory conduct against plaintiff .Probst as the most intense and caused him the most compensatory damages during the calendar year 1992 because it was during that year that the pretextual OPR investigations of himself and his wife were underway.[10]

Early in the next year, 1993, defendant was notified of the results of the DEA/OPR investigation of him. He was notified that he would be punished for what he knew, and for what have now been conceded, to be pretextual reasons with a ten-day suspension from his work with the DEA. Plaintiff Probst served the ten-day suspension in May of 1993. His emotional pain and suffering did not end, but persisted thereafter because he knew the reasons for his ten-day suspension were a pretext for his speaking out against race discrimination within the DEA.

In 1994, the intentional unlawful retaliatory conduct of defendants against plaintiff Probst had a less detrimental effect on plaintiff Probst than in the previous two years causing him emotional distress and compensatory damages that persisted, but were nonetheless diminished from those in 1992

and 1993. Also in 1994, he mitigated his compensatory damages by taking the appropriate lawful action of filing this lawsuit. During 1995 the retaliatory conduct had a further diminished effect on plaintiff, but still a lingering mental anguish persisted that adversely affected plaintiff Probst's life. The defendants' counsel's pretrial concessions and position at trial as well as the trial itself, plus this verdict in plaintiff's favor are all mitigating factors during 1995 as to the emotional pain and mental anguish to which plaintiff Probst had previously been subjected for the last four years.

## II. *Plaintiff's Compensatory Damages for Injuries to Him Proximately Caused by Actions Taken Against His Wife*

Included in the $180,000 damage determination, indeed within the amount of $85,000 for the year 1992, is the amount of $30,000 of compensatory damages for the emotional pain and mental anguish suffered by plaintiff Probst for the defendants' intentional, unlawful retaliatory action taken against plaintiff by the defendants' initiation of the DOJ/OPR investigation of plaintiff's wife, Assistant United States Attorney (AUSA) Vilija Bilaisis. ASAC Vanacora and G/S Woolley directly and intentionally caused a Department of Justice (DOJ) OPR investigation to be initiated against plaintiff Probst's wife in January 1992. Ms. Bilaisis was in 1992, and remains today, an Assistant U.S. Attorney for the Northern District of Illinois. This DOJ/OPR investigation of AUSA Bilaisis was an act of intentional unlawful retaliation against plaintiff's Probst for his speaking out and exposing the racial discrimination in the DEA. The defendants' conduct in initiating the DOJ/OPR investigation of AUSA Bilaisis was intended by defendants to be and in fact was, in addition to the emotional pain and mental anguish resulting to plaintiff Probst for defendants' retaliatory acts taken against plaintiff in his employment with the DEA. The monetary figure the court finds appropriate to compensate plaintiff Probst for this emotional pain and mental anguish is $30,000. The court has included this $30,000 amount

10. The court will discuss the compensatory damages suffered by plaintiff Probst as the proximate result of the investigation of his wife in the next section of this opinion.

as part of the compensatory damages of $85,000 suffered by plaintiff Probst during the year 1992.

Government counsel conceded in closing argument that the law recognizes that an individual may bring a claim for retaliation by a defendant that proximately resulted from the protected actions or expressions of a relative of the individual. *See EEOC v. Ohio Edison Co.*, 7 F.3d 541, 544 (6th Cir. 1993) (citing *De Medina v. Reinhardt*, 444 F.Supp. 573 (D.D.C.1978), *aff'd in part and remanded in part*, 686 F.2d 997 (D.C.Cir. 1982). Accepting that as the law it would seem reasonable and within the scope of the Civil Rights Act of 1991 that a plaintiff, who is the expressor, should be allowed to recover compensatory damages, such as emotional pain and mental anguish, suffered by the plaintiff from actions taken by defendants against a loved-one of the plaintiff, such as a spouse, in retaliation for the plaintiff's expression, especially were the evidence shows the retaliation was intended by defendants to cause emotional pain and mental anguish to the plaintiff. Neither counsel nor the court could locate a published opinion on point which supports or undermines this determination in this unprecedented situation.[11]

The court notes that during the testimony of plaintiff's spouse, Ms. Bilaisis, the court expressly ordered Ms. Bilaisis to separate from her own emotional harm that which she observed was suffered by plaintiff. The court in viewing her demeanor and listening to Ms. Bilaisis' testimony finds that she did just that. The court made that order to ensure that Ms. Bilaisis was not testifying about harm to herself, but only about harm to plaintiff that she personally observed. This is because, as this court previously held, plaintiff cannot recover for any harm suffered by his spouse. (Mem. Op. Oct. 6 1995.)

 The court finds that the DOJ/OPR investigation of plaintiff's spouse was an act of intentional unlawful retaliation by defendants against plaintiff for his speaking out against racial discrimination in the DEA and

as a proximate result of that act suffered emotional pain and mental anguish in the amount of $30,000 for that act of retaliation in addition to the other compensatory damages he suffered.

### CONCLUSION

For the reasons and on the bases stated herein, the court finds in favor of the plaintiff and against the defendants on liability and damages. The court further finds that plaintiff has proven by a preponderance of the evidence that he suffered compensatory damages in the amount of $180,000 in addition to the other damages upon which the parties have previously agreed. Plaintiff is entitled to costs and reasonable attorney fees. Judgment is entered accordingly. All pending motions are moot.

11. The Seventh Circuit in another context commented in *N.L.R.B. v. Advertisers Mfg. Co.*, 823 F.2d 1086, 1088 (7th Cir.1987):

"To retaliate against a man by hurting a member of his family is an ancient method of revenge, and is not unknown in the field of labor relations."