UNITED STATES of America,
Plaintiff,

v.

Deral WILLIS, Larry Martin, Carlos Curry, Stanley Wright, Harold Williams, and Christopher Epison, Defendants.

No. 91 CR 463.

United States District Court,
N.D. Illinois,
Eastern Division.

March 5, 1999.

Colleen D. Coughlin, AUSA, Chicago, IL, for U.S.

Gerald J. Collins, Chicago, IL, for Stanely Wright.

Deral Willis, Metropolitan Correctional Center, Chicago, IL, defendant pro se.

Thomas K. McQueen, Katherin J. Strandburg, Jenner & Block, Chicago, IL, David W. Gleicher, Chicago, IL, Raymond D. Pijon, Chicago, IL, Michael Falconer, Chicago, IL, for Christopher Epison.

## ORDER

LOZANO, District Judge.

This matter is before the Court on several motions. The rulings are as follows: (1) the Amended Motion for New Trial filed by Defendant, Carlos Curry, on October 13, 1998, is **DENIED;** (2) Christopher Epison's Rule 33 Motion for New Trial, filed on October 26, 1998, is **DENIED;** (3) the Second Amended Motion for New Trial filed by Defendant, Larry Martin, on October 23, 1998, is **DENIED;** (4) the Motion

for New Trial filed by Defendant, Harold Williams, on October 7, 1998, is **DENIED;** (5) the Motion for New Trial or Evidentiary Hearing filed by Defendant, Deral Willis, on October 6, 1998, is **DENIED;** (6) the Motion for New Trial filed by Defendant, Stanley Wright, on October 20, 1998, is **DENIED;** (7) Defendant's Motion for Extension of Time Due to Government's Failure to Comply With Court's Order, filed by Defendant, Deral Willis, on October 27, 1998, is **DENIED;** (8) Defendant's Motion Concerning Government's Response, filed by Defendant, Deral Willis, on December 2, 1998, is **DENIED;** and (9) Defendant's Request to Adopt Epison's Memorandum of Law/Appendix of Exhibits, filed by Defendant, Deral Willis, on October 30, 1998, is **GRANTED.** In addition, deadlines for submissions on resentencing of Defendants, Stanley Wright and Harold Williams, are set herein.

*BACKGROUND*

Now before the Court[1] on defense motions for new trials, this case involves the prosecution of several members of a large drug distribution network. The network operated during 1986–91 and became known as the "Claiborne conspiracy," after its leader, Mario Claiborne. Put briefly, the new trial motions are based on alleged misconduct, bias, and false testimony involving law enforcement agents and prosecution witnesses. Several players on the prosecution side are discussed extensively below and will be introduced here.

Group 12 of the Chicago Field Office of the Drug Enforcement Administration ("DEA") worked on the Claiborne investigation. During pertinent times, James Woolley was the supervisor of Group 12. Special Agents Peter Probst, John Wooten, and Michael Kress worked under Woolley in Group 12 and on the Claiborne investigation. Probst was the case agent on the investigation at first, followed by Wooten. Joseph Vanacora was the Associate Special Agent in Charge of the Chicago Field Division of the DEA, and was in a supervisory position over all of the above-mentioned agents. Vilija Biliasis was an Assistant United States Attorney; married to Probst, she worked on the Claiborne case. Eduardo Castillo was charged in the Claiborne conspiracy and cooperated with the Government.

Following initial investigation, agents obtained permission from a district judge to place wiretaps on three telephones in Claiborne's residences in May 1991. The wiretaps lasted thirty days, after which agents began arresting Claiborne and his co-conspirators. In April 1992, a lengthy trial began. Probst, Wooten, and Castillo testified for the Government. Kress was called to testify by Defendant, Christopher Epison. The Defendants whose motions are now before the Court—Epison, Deral Willis, Stanley Wright, Harold Williams, Carlos Curry, and Larry Martin—were convicted of various drug offenses and received lengthy sentences. All are currently represented by counsel, with the exception of Willis, who has chosen to proceed pro se.

These Defendants now ask the Court for a new trial. They stress the undisputed fact that before trial, Special Agent Wooten stole $12,700 of currency seized in the Claiborne investigation. Defendants also accuse other Group 12 agents of racial bias, mishandling the wiretap, and overall shoddy work. Finally, Defendants stress the uncontested fact that Castillo lied at the trial when he said he had stopped using cocaine. As explained below, these points do not warrant a new trial.

*DISCUSSION*

Before addressing the merits, timeliness must be discussed (although the parties have not done so). Defendants base their motions on newly discovered evidence and Federal Rule of Criminal Procedure 33, under which the motions must "be made only before or within two years after final judgment." This requirement cannot be

---

1. The undersigned is sitting by designation.

extended and appears jurisdictional. *See* Fed.R.Crim.P. 33, 45; *Guinan v. United States*, 6 F.3d 468, 470 (7th Cir.1993); 3 Charles A. Wright, *Federal Practice & Procedure* § 558, p. 360 (2d ed.1982).

Defendants' appeals concluded in March 1995. They did not file fully briefed Rule 33 motions until more than two years later, in October 1998.[2] However, Rule 33 only requires that motions be "made" within two years, and by March 1997, each Defendant had made clear to the Court, to the Government, and on the record orally, in writing, or in some combination thereof, that he wanted a new trial on the grounds ultimately briefed in final written form and filed in October 1998.[3] Given these circumstances, the Court concludes that Defendants' motions were "made" within the two-year time limit. *See* Wright, *supra*, § 558, at p. 365; *Parojcic v. Bethlehem Steel Corp.*, 170 F.R.D. 14 (N.D.Ind.1996).

■■■ Turning to the merits, Defendants argue that the Government violated the doctrine of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

> In order to mount a successful *Brady* challenge, a defendant must establish the following: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial. Evidence is material only if there exists a "reasonable probability" that its disclosure to the defense would have changed the result of the trial. However, this standard does not require the defendant to prove that it is more likely than not that disclosure of the evidence would result in acquittal. A

reasonable probability of a changed result exists where the suppression of evidence "undermines confidence in the outcome of the trial."

*United States v. Silva*, 71 F.3d 667, 670 (7th Cir.1995) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Evidence that bears "on a witness's credibility can be material when it has significant impeachment value." *United States v. Dimas*, 3 F.3d 1015, 1017–18 (7th Cir.1993).

## I. Matters Principally Involving Special Agent Probst

### A. General Controversy Surrounding Probst

Aside from the theft by Wooten and cocaine use by Castillo, the parties' arguments are built heavily on statements that Special Agent Probst and other DEA personnel delivered during internal investigations and a civil suit involving Probst. By any account, Probst was embroiled in controversy with his colleagues during the Claiborne investigation and through the time of Defendants' trial. Probst filed an "EEO" complaint alleging that he and Wooten, an African–American, were being subjected to racially motivated harassment by other agents. Also, Probst learned that he was under internal investigation by the DEA for misconduct, and that his wife, AUSA Biliasis, was also under internal investigation for misconduct. Several of Probst's colleagues reported in writing to Group 12 supervisors Woolley and Vanacora that Probst was abrasive, difficult to work with, and possibly paranoid. Probst prepared a fifty-page rebuttal to these reports and other allegations against him.

---

**2.** That it took Defendants so long to get their final motions on file is due to the many extensions and protracted discovery requested by Defendants and the Government. The Court made every attempt to keep matters moving, but at every turn the parties asked for more time. *See* Orders of 6/4/96, 9/16/96, 10/24/96, 2/18/97, 3/25/97, 5/15/97, 5/27/97, 7/30/97, 9/23/97, 10/17/97, 10/31/97, 12/3/97, 12/5/97, 12/15/97, 1/6/98, 2/25/98.

**3.** *See* Record items numbered 1250, 1290, 1304, 1314, 1341, 1370, 1375, 1380, 1398. In addition to these written indications, oral comments made both off the record and on the record in proceedings as yet untranscribed further show that Defendants had "made" their motions.

Woolley gave Probst an evaluation of "excellent," which Probst felt was too low, appealed, and got raised to "outstanding." Probst and Biliasis threatened to sue Woolley and Vanacora for slander and violations of constitutional rights. The statements of Probst and others allege that additional accusations, threats, and Machiavellian maneuverings occurred.

In 1994, well after Defendants' trial, Probst filed an employment discrimination suit against the Attorney General and the Administrator of the DEA, alleging that he had been harassed in retaliation for speaking out against what he perceived as racial discrimination against Wooten and his colleagues' incompetence during the Claiborne investigation. *See Probst v. Reno,* 917 F.Supp. 554 (N.D.Ill.1995). After the defendants in that suit lost a summary judgment motion attacking the legal and evidentiary basis for Probst's claims, *Probst v. Reno,* 1995 WL 613129 (N.D.Ill. Oct.17, 1995), the parties entered a settlement where the defendants did not admit liability, and they let the district judge decide the lion's share of the damages issues, 917 F.Supp. at 558, 563. The judge awarded Probst $180,000 in compensatory damages. 917 F.Supp. at 563.

Relying chiefly on Probst's words delivered during the investigations and civil suit, Defendants charge that Group 12 agents were racists and engaged in a variety of misconduct during the Claiborne investigation, and that this information about the agents should have been disclosed to Defendants before trial. The information is categorized and addressed below.

### B. Allegations of Racial Bias

Probst reported that during the Claiborne investigation, he became convinced that other agents in Group 12 were biased against Wooten because he is African–American. Probst believed that other agents were undermining Wooten because of his race. Ultimately, Probst filed an internal "EEO" report stemming from the alleged bias against Wooten.

Probst based his conclusion that racial bias existed on several factors. According to Probst, Woolley made racist comments about African–American DEA workers and suspects. For example, Woolley allegedly stated, "Pete [Probst] says [Wooten's] pretty good for a nigger." Woolley also allegedly deemed the Claiborne investigation an unimportant waste of time in comparison to those with a South American connection, commenting, "[A]ll you got here is niggers selling dope to niggers? There's no harm or foul there." In addition to these and other comments by Woolley, Probst could not explain what he saw as Group 12 members' sloppy work and hostility toward him and Wooten as anything other than a reaction to Wooten's joining the group. After he filed the EEO report, Probst received several late-night "hang-up" calls at home from an unknown person or persons. He also received two calls from an unknown person or persons who said "nigger lover" and hung up. Probst claims that Wooten agreed with him that other agents were racially biased against Wooten.

### C. Theft By Special Agent Kress and Sloppy Performance

According to Probst, other agents assigned to the Claiborne case were slipshod and worse in their work. Kress sometimes performed assigned surveillance improperly or not at all. Probst reported this to Woolley, who did nothing except to eventually transfer Kress to work under a supervisor other than Probst. Probst accused Kress of stealing jewelry seized during a search that was part of the Claiborne investigation. Probst also asserted that agents did not work the wiretap properly. They filled out log books incorrectly or not at all, and failed to prepare assigned transcripts. They "minimized" pertinent calls. Pen registers were also rendered inoperable. One morning, Probst said, Wooten found the agent monitoring the wiretap

asleep and the wiretap equipment turned off. Probst reported all this to Woolley, who did nothing. Biliasis also reported the problems to Vanacora, who reacted by telling Probst, "Control your wife."

In addition to these criticisms, Probst has leveled others against his co-workers, accusing them of incompetence and dishonesty. The general tenor of Probst's view is already established: His colleagues were incompetent, racist, dishonest, and out to get him for complaining about their faults. The Court need not cover every detail that forms the foundation for that view.

In addition to Probst's statements, Wooten gave a statement regarding work practices in Group 12. He said that Woolley's safe was frequently used to store unsealed money, drugs, and other evidence. All members of Group 12 had access to the safe, as the combination was written on a desk that was accessible to all of them. Woolley once left as much as $800,000 in currency in unsealed suitcases in his office unattended and overnight. The currency had not been counted and was protected only by the standard lock on the door to Woolley's office.

Regarding the money he stole, Wooten said that on a Friday afternoon about a week after it was seized, he took the money from an unsealed envelope laying on Woolley's desk. Wooten believed someone had been "reprocessing" the exhibit containing the money, got distracted, and left it there. Wooten took some but not all of the money in the exhibit. He did not realize that paperwork documenting the amount of the money in the exhibit had already been submitted. He noted that such paperwork was frequently submitted several weeks late.

## D. Views Contradicting Probst

Probst's negative view of his colleagues is contradicted by others. With the exception of the theft by Wooten, every charge of incompetence, racism, dishonesty, and vindictiveness that Probst has made against his colleagues has been contradict-

ed or minimized, expressly or implicitly, in statements given by Wooten, Vanacora, Woolley, and other DEA personnel. These statements portray Probst as a skilled agent, but abrasive, controlling, contemptuous of his co-workers, and harboring possibly paranoid beliefs. They also portray the agents besides Probst as competent if not always perfect investigators, untainted by racial prejudice, who, although they found Probst difficult to work with, never tried to railroad him on unfounded charges.

## E. Analysis of the Allegations

■■■ To be deemed "material" under *Brady*, evidence must be admissible. *Silva*, 71 F.3d at 670; *Dimas*, 3 F.3d at 1018–19. Although Defendants have not been terribly specific, it seems they would have tried to use much of the alleged misconduct in Group 12 to attack the credibility of testifying agents. However, "[s]pecific instances of the conduct of a witness" other than conviction of a crime are not broadly admissible to attack a witness' credibility (and may not be proved by extrinsic evidence). Fed.R.Evid. 608(b). Rather, such instances of misconduct may "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning the witness' character for truthfulness or untruthfulness." *Id.*; see *Dimas*, 3 F.3d at 1019; *United States v. Veras*, 860 F.Supp. 471, 478 (N.D.Ill.1994), *aff'd*, 51 F.3d 1365 (7th Cir. 1995). The slipshod investigative work that Defendants have charged the agents with amounts to specific instances of conduct that were not obviously probative of veracity, and much of which involved nontestifying agents, so the Court would have barred those incidents' admission pursuant to Rule 608(b). *See Dimas*, 3 F.3d at 1019. Even if Defendants could get around Rule 608(b), evidence always may be excluded under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

the issues, or misleading the jury, or by considerations of undue delay, [or] waste of time." Fed.R.Evid. 403; *see United States v. Saunders,* 166 F.3d 907, 1999 WL 44345, at *11 (7th Cir. Feb.2, 1999) (noting that the probative value of Rule 608(b) evidence "must still outweigh the danger of unfair prejudice, confusion of the issues, or misleading the jury"); *Hynes v. Coughlin,* 79 F.3d 285, 294 (2d Cir.1996) ("The trial judge has discretion under Rules 608(b) and 403 to determine whether . . . information, though relevant should be excluded."). Defendants largely have not tied the supposed poor agent work to any of the evidence presented at their trial, and opening the door to Probst's general attacks on the competence and character of his colleagues could easily have led to a mini-trial that would have mirrored Probst's eventual civil suit. The probative value of such a mini-trial in a criminal proceeding would have been substantially outweighed by the danger of confusing or misleading the jury and wasting time in an already lengthy trial.

In sum, this Court would not have let a drug conspiracy trial include a protracted side-show of Probst branding his colleagues incompetent, dishonest bigots and the colleagues branding Probst a paranoid troublemaker. No doubt, some tension and mistrust existed in Group 12 during the Claiborne investigation, but interpersonal squabbles between agents cannot be allowed to take center stage in a criminal trial. *See United States v. Bari,* 750 F.2d 1169, 1179 (2d Cir.1984) (noting that "[c]onducting a mini-trial on" the implications of Rule 608(b) evidence "might well have been a time-wasting, confusing digression ultimately degenerating into a battle of [expert] opinions."); *United States v. Ortiz,* 5 F.3d 288, 290–91 (7th Cir.1993) (stressing the minimal relevance of an agent's having misreported his hours of court attendance). Because much of the Probst-centered evidence was not admissible, failing to disclose it did not violate *Brady.*

That said, the Court will turn specifically to some of the more noteworthy individual points Defendants raise regarding the alleged conduct and biases of DEA personnel. A witness' bias against a defendant is generally admissible, *Veras,* 860 F.Supp. at 478, and the Defendants now before the Court, all African–Americans, allege that prejudice against African–Americans was rampant in Group 12. The evidence of prejudice comes only from Probst, who directly implicates only Woolley. Assuming that Woolley was prejudiced against African–Americans (he has denied it as well as making any racially derogatory comments) he did not testify at trial, and therefore his bias was not automatically relevant. *See Silva,* 71 F.3d at 670 (noting that "the unsavory nature of [a nontestifying informant] is not admissible into evidence merely to make the prosecution appear dissolute by association"). Perhaps if Woolley had played a key role in the Claiborne investigation, Defendants would have had a stronger case for getting his bias before the jury even though he did not testify. But Woolley's exact role in the investigation is not evident.

The evidence of racial bias among other DEA personnel is thin. When Probst could not explain what he saw as Group 12 members' sloppy work and hostility, he figured they had to be rooted in Wooten's race. Such logic is questionable. No one has identified the caller to Probst's home. Wooten himself states that he lied when he told Probst he agreed he was the target of racial discrimination, doing so because he feared angering Probst. In fact, Wooten and other agents have reported that Wooten felt Probst and Biliasis were harassing him by pressuring him to file an "EEO" complaint when he did not want to, and that Wooten asked his superiors to shield him from Probst.

Even assuming that racial prejudice existed, Defendants have not pointed to one instance where such prejudice influenced the case. No one alleges that any agent acted illegally, unfairly, or even aggres-

sively toward Defendants because of their race. Indeed, Woolley's alleged comment about the importance of the Claiborne case—reprehensible as it might be if it occurred—suggested to Probst that the case was not worth aggressive investigation. Similarly, in Probst's view, the other agents were not making the case stronger against Defendants because of racism, but instead were undermining it.

Overall, the lack of a link between alleged racism and concrete harm to Defendants means the probative value of the alleged racism was substantially outweighed by the danger of sidetracking the jury and misusing time on a mini-trial on racism within Group 12. The evidence of racial bias was inadmissible under Rule 403.

Even if the evidence was admissible, it was not otherwise material under *Brady*. Racism is an evil, and the idea of law enforcement agents abusing their power to wrongfully convict persons because of race is nightmarish. Although the specter of bigotry that Defendants raise is concerning, it ultimately is not specific enough to undermine confidence in the outcome and justify overturning a jury verdict and ordering a new trial.

Probst has alleged that Kress, who did testify at trial, stole jewelry from a seizure related to the Claiborne case. Theft is an instance of conduct that is probative of veracity and therefore generally may be inquired into under Rule 608(b). *United States v. Smith*, 80 F.3d 1188, 1193 (7th Cir.1996).

■ Kress' alleged theft is not material for a variety of reasons. Woolley has stated that months before Defendants' trial, he investigated Probst's theft accusation and found it unsubstantiated. Nothing in the record suggests that anything more came of the accusation before (or after) trial. A shaky factual basis for the notion that the theft ever occurred means that the probative value of it (merely impeaching) was substantially outweighed by the danger of sidetracking the jury with a speculative accusation, making the alleged theft inadmissible. Fed.R.Evid. 403.

Even if it had been admissible, Defendants could not have used it to smear the entire prosecution team, as they seem to assume. Due to Rule 403 concerns, the Court would only have allowed the theft into evidence for Rule 608(b) purposes, i.e., attacking Kress' credibility in terms of his character for veracity. Kress' testimony related only to Epison—who actually called Kress as a witness, not the Government—so Kress' veracity was not relevant to the other Defendants. Indeed, no Defendant bothered to cross-examine Kress, signaling that they did not consider his testimony important and would only have sought to use the alleged theft to attack the prosecution's integrity as a whole. In addition, read literally, Rule 608(b) suggests that Kress' alleged theft could only have been "inquired into on cross-examination of the witness," which would have prevented Epison from asking Kress about it on direct. Still, some room for bending this requirement in particular circumstances may exist. *See United States v. Wright*, 542 F.2d 975, 979 (7th Cir.1976), *overruled on other grounds, United States v. Hollinger*, 553 F.2d 535, (7th Cir.1977); *United States v. Marroquin*, 885 F.2d 1240, 1246–47 (5th Cir.1989). In any event, as covered below in connection with Wooten's theft, the trash incident Kress testified about was not material in convicting Epison. No *Brady* violation occurred with respect to the alleged theft by Kress.

■ Wooten stated that DEA personnel sometimes stored evidence in ways that Defendants now deem improper. Defendants have not shown that the evidence storage departed from standard practice among law enforcement agents. Perhaps leaving $800,000 in an office over night protected only by a standard door lock speaks for itself, but that alleged event happened only once, and we do not know when or why. As for the rest of the practices described, human beings must freely handle evidence to successfully pros-

ecute cases, and no one has specifically shown how late paperwork might materially affect the integrity of evidence in general. More to the point than these general observations, Defendants have not suggested that the alleged DEA practices affected the integrity of any specific evidence presented in their trial. Although the term "chain of custody" is tossed about, "the possibility of a break in the chain of custody of evidence goes to the weight of the evidence, not its admissibility," so even showing a break does not mean evidence would have been excluded. *United States v. Brown,* 136 F.3d 1176, 1182 (7th Cir.1998). Overall, except for the *fact* of Wooten's theft, any evidence of mishandling evidence had insufficient probative value to be admissible under Rule 403 in light of the danger of getting sidetracked on issues of minimal importance. This was a trial on specific criminal charges against Defendants, not a test of the general work habits of Group 12.

### F. Probst's Personal Stake In The Outcome

■ Besides attacking other DEA witnesses' credibility, Defendants also attack Probst. He claimed in his civil suit that after he learned of the investigations of him and Biliasis and through the time Defendants were tried, he was under severe mental stress and his health deteriorated. He stated that he believed he would be fired if he "was anything less than an outstanding employee." He said he felt compelled to "put out 110 percent" every day or be fired. The materials submitted to the Court suggest that Probst was being investigated primarily if not exclusively based on the interpersonal conflicts he had with co-workers in general, not for the quality of his investigative work in the Claiborne case.

Defendants argue that Probst's fear of being fired gave him a personal stake in the outcome of their case, which amounted to a bias for the Government that should have been disclosed and would have dimin-

ished Probst's credibility as a witness. Defendants read too much into isolated phrases in Probst's civil deposition. He merely stated in passing that he felt compelled to do his job well. He did not say that he felt compelled to ensure Defendants' convictions at all costs, and no Defendant has suggested that he did anything improper. Any probative value of the pressure Probst felt from the investigation would have been substantially outweighed by the possibility of sidetracking the jury and misusing time by opening the door to a detailed examination of the investigation of Probst. Fed.R.Evid. 403. No *Brady* violation occurred with respect to Probst's alleged bias because the bias was inadmissible. *See Saunders,* 166 F.3d at 918 (affirming the exclusion of a report of an investigation of a DEA expert where the report was offered to show bias).

### G. Post-trial Events Involving Probst

■ On a general note regarding Probst, the Court is mindful that he obtained a partial settlement and a considerable damages award in his suit arising out of events that occurred during and after the Claiborne investigation and trial. Probst's suit, however, was initiated and concluded after Defendants' trial, and under *Brady* what matters is evidence that was available at trial, not evidence previously unavailable that could be used today. *United States v. Veras,* 51 F.3d 1365, 1375 (7th Cir.1995).

Still, Defendants turn to the general test for a new trial based on newly discovered evidence to take advantage of post-trial events involving Probst. Under that test, "the defendant must show that the evidence (1) came to [his or her] knowledge only after the trial; (2) could not have been discovered sooner had the defendant[ ] exercised due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of retrial." *Id.* (quoting *United States v. Oliver,* 683 F.2d 224, 228 (7th Cir.1982)). The defendants

in Probst's civil suit did not admit liability in the partial settlement, *Probst,* 917 F.Supp. at 558, so the outcome of the suit does not demonstrate that Probst's accusations of misconduct, racism, etc., were accurate. What happened to Probst as a civil plaintiff after the Claiborne trial would not "probably lead to an acquittal in the event of a retrial." *Id.*

### H. Wiretap Irregularities

Some Defendants argue that the irregularities in the wiretap of phones in Claiborne's residences described above and reported by Probst entitle them to a new trial. Defendants assert both that all the wiretap evidence should have been suppressed under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.,* and that the Government's failure to disclose the irregularities violated *Brady.* Contrary to direction previously given by the Court, Defendants' arguments are cursory.[4] In its response, the Government argues in detail that no error requiring a new trial occurred, stressing that (1) before trial Defendants received documentation that put them on notice of most of the alleged irregularities, (2) any irregularities actually undermined the investigation instead of bolstering it, (3) Probst himself has stated that he cleaned up any errors before presenting information to the judge handling the wiretap, (4) the incident where the agent fell asleep was an isolated one in a thirty-day wiretap and Defendants have shown no prejudice from it, and (5) the theft and other misconduct by Wooten, the affiant on the wiretap, happened after the wiretap was over. Most Defendants did

not file reply briefs, and no Defendant who did included a principled rebuttal to the Government's position.

By now if not before, Defendants have available all the materials needed to make a conscientious argument showing that Probst's allegations about inaccurate record-keeping and other irregularities were true and that the irregularities prejudiced them. No Defendant has done so. Defendants' arguments regarding wiretap regularities are waived. *See United States v. McClellan,* 165 F.3d 535, 1999 WL 2017, at *16 (7th Cir. Jan.4, 1999).

### II. *False Testimony By Eduardo Castillo*

 Eduardo Castillo testified for the Government, among other things stating that he supplied cocaine to Claiborne. The Government concedes that Castillo lied on the stand, saying that he had stopped using cocaine months before the trial when he actually was using a half of a gram every two days through the time of the trial and after. Some Defendants now point to Castillo's undisclosed drug use as supporting their requests for a new trial.

 Conceivably, this false testimony is governed by the *Brady* test or by a more general test for requests for a new trial based on false testimony. Either way, Castillo's false testimony does not warrant a new trial. Castillo did tell the jury he was a drug user and drug dealer who was testifying in exchange for favorable treatment from the Government. Thus, his credibility was seriously damaged at trial. Evidence that Castillo used drugs for longer than he said would only

---

4. When setting a final briefing schedule for the new trial motions, the Court stated as follows:

 Each Defendant must file his own individual motion for new trial, which must be supported by a *professionally prepared brief.* Defendants may not adopt each other's motions, except for purely legal issues that are not tied to the facts of an individual Defendant's case. In other words, if an individual Defendant's position requires the Court

 to apply the law to the evidence and circumstances pertaining to that Defendant, then the Defendant should make his own arguments. The Court will not search the record to dig up the facts that pertain to a particular Defendant, and Defendants should err on the side of making their own arguments. *Motions which merely invite the Court to scour the record looking for error will be denied out of hand.*

 Order of 7/20/98 (emphasis added).

have added minimally to the impeachment. The suppression of "[e]vidence that impeaches an already thoroughly impeached witness ... cannot give rise to a *Brady* violation." *United States v. Kozinski,* 16 F.3d 795, 819 (7th Cir.1994); *accord United States v. Payne,* 63 F.3d 1200, 1210 (2d Cir.1995). A new trial is warranted under the general test for false testimony when (1) "[t]he court is reasonably well satisfied that the testimony given by a material witness is false," (2) "[t]he jury might have reached a different conclusion absent the false testimony or if it had known that testimony by a material witness was false" and (3) "[t]he party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial." *United States v. Fruth,* 36 F.3d 649, 652 (7th Cir.1994). Because the jury already knew of Castillo's drug use, crimes, and relationship with the Government, the further impeachment mileage that Defendants were denied is not enough to satisfy prong (2) above. *See id.; Jarrett v. United States,* 822 F.2d 1438, 1445–46 (7th Cir.1987). Furthermore, no Defendant has suggested that Castillo's testimony regarding the substance of the charged crimes was untruthful or inaccurate because of his drug use. *See Jarrett,* 822 F.2d at 1445–46.

█ Some Defendants suggest that the Government knew Castillo was lying at the time of trial, thus implicating another test, this one for knowing use of perjured testimony. "In order to receive a new trial on the basis of the government's use of allegedly perjured testimony, the defendant must establish that: (1) the prosecution's case included perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) there is a likelihood that false testimony affected the judgment of the jury." *United States v. Magana,* 118 F.3d 1173, 1191 (7th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 1104, 140 L.Ed.2d 158 (1998).

Defendants stress that Castillo was on release under control of the probation office during the time that he continued to use cocaine. They suggest that the Government therefore knew or should have known of his drug use at the time of trial. The Government maintains that it learned of the drug use only after the trial.

Months ago, the Court ordered Castillo's entire probation file turned over to Defendants. This order specifically stated that any records of drug testing had to be disclosed. Despite having access to these records, the Defendants who assert the Government had knowledge of Castillo's continued drug use offer nothing to show it. They do not discuss the content of the probation file, the frequency and adequacy of drug testing, etc. Without having some sense of the facts, the Court cannot assume that the Government knew or should have known that Castillo continued using cocaine. Defendants have failed to meet requirement (2) of the test for knowing use of perjured testimony.

█ "Moreover, the alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence." *United States v. Adcox,* 19 F.3d 290, 295 (7th Cir.1994). In other words, "it must relate to a material fact as opposed to some collateral issue." *Id.* at 296. Castillo's false testimony related only to his personal drug use, not the factual guilt of Defendants. In this way, too, Defendants have not met the test. *See id.* (stressing that a witness' possible false testimony about whether he was an accomplice to a murder or merely an innocent bystander did not affect his ability to observe the murder).

### III. *Theft By Special Agent Wooten*

█ It is undisputed that before trial, Wooten stole $12,700 in currency seized during the Claiborne investigation. As the Government concedes, this theft would have been admissible to impeach Wooten under Rule 608(b). Moreover, because the theft undoubtedly occurred during the in-

vestigation and was perpetrated by a testifying agent, the Court deems it admissible under Rule 403. Defendants call the Government's failure to disclose the theft a *Brady* violation.

The only serious response [5] by the Government is that Wooten's testimony was not material. The Court will assume that the jury would have taken the theft to heart and declined to rely on any testimony Wooten gave. *See United States v. Davis*, 960 F.2d 820, 825 (9th Cir.1992). The question then becomes whether confidence in the outcome is still maintained after discounting Wooten's testimony. *See id.* at 827 & n. 3; *United States v. Garcia*, 13 F.3d 1464, 1472 (11th Cir.1994) (noting that another agent "could have replaced [an agent later tainted by impeachment evidence] with no substantive change in testimony" so no different result would have occurred); *Payne*, 63 F.3d at 1210 (noting that *Brady* does not demand a new trial when the testimony of an impeached witness is corroborated by other evidence); *United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391 (7th Cir.1985) (noting that "material" evidence under *Brady* includes "evidence affecting the credibility of prosecution witnesses when the reliability of those witnesses may be determinative of guilt or innocence"). Before turning to the evidence against each Defendant, some general issues will be addressed.

Defendants stress that Wooten acted as a case agent and was present throughout the trial. Yet they do not cite or discuss the record to show what it was that Wooten specifically did in the generic role of case agent to bolster the charges against them. Defendants do not challenge the Government's assertion that other witnesses and evidence supplied or could have supplied the same general information Wooten supplied as case agent.[6] The Court assumes that Wooten's general role

as case agent was not material to the convictions of Defendants. *See Garcia*, 13 F.3d at 1472; *United States v. Snoddy*, 862 F.2d 1154, 1156 (5th Cir.1989).

■ Besides his pretrial theft, Defendants point to Wooten's post-trial misconduct and conviction. These post-trial occurrences are not a consideration under *Brady*, which deals only with evidence that existed and was suppressed at the time of trial. *Veras*, 51 F.3d at 1375. Under the general test for newly discovered evidence, a new trial cannot be based on evidence that is "merely impeaching or cumulative." *Id.* Assuming they are admissible, Wooten's post-trial experiences are merely cumulative to the impeaching effect of the theft. The analysis below of the impact of Wooten's testimony on each Defendant shows that even destroying his credibility entirely would not allow Defendants to meet the general test's additional requirement that the new evidence "would probably lead to an acquittal in the event of a retrial." *Id.*

Finally, as with Kress, Defendants seem to assume that Wooten's theft could have been used to smear the entire prosecution team. As with the alleged Kress theft, however, Wooten's theft could only have been inquired into during cross-examination of Wooten for the purpose of attacking his character for veracity. Fed.R.Evid. 608(b); Fed.R.Evid. 403.

Turning to the Defendants individually, Larry Martin was convicted of one count of conspiracy (21 U.S.C. section 846). In its case against Martin, the Government relied in part on Leland Legghette, David Williams, Jimmy Lee Collins, and Eula Scott, all confessed criminals who were testifying in exchange for favorable treatment. These witnesses' testimony indicated as follows: Martin, his co-Defendants Wright and Williams, and Collins were

---

5. The Government makes a half-hearted argument, based on one state case, that Wooten's theft was not "suppressed" within the meaning of *Brady* because Wooten's knowledge of his completely unauthorized theft cannot be imputed to the prosecutors.

6. *See infra* n. 4.

part of a close-knit group involved in narcotics dealing. Martin supervised extensive sales of cocaine in the area of 44th and Greenwood in Chicago. Martin was a major dealer in the area and was often seen together with Mario Claiborne. Legghette regularly delivered cocaine to Martin at various locations for Claiborne. Claiborne, Martin, and Scott, Claiborne's girlfriend, took a cruise and a trip to Las Vegas together, with Martin paying for the cruise to reduce a debt he owed Claiborne. Legghette, Williams, Collins, and Scott testified to these facts in detail and to some extent corroborated each other.

The Government also relied on law enforcement witnesses. Wooten testified as follows: Pen register monitoring over six months showed over 2700 calls from Martin's townhouse to pagers, over 500 calls to his mother's address near 44th and Greenwood, and over 80 calls to Claiborne's residence. While on surveillance on one occasion, Wooten saw Martin taking money from other men who apparently were selling drugs in high volume at 44th and Greenwood. On surveillance another time at the same location, Wooten saw Martin conversing with other men who were apparently selling drugs. Yet another time, Wooten saw Martin and Claiborne together in a vehicle.

Officer Brady testified that he once saw a car he knew Claiborne to drive parked in front of Martin's townhouse. Not exactly scoring points for the Government, Officer Brady also testified to having seen Martin at his townhouse, which was located on 87th Street, at about the same time as one of Wooten's above-described observations of Martin at 44th and Greenwood.

The balance of evidence discussed so far is perhaps troublesome. On the one hand, cooperating witnesses gave substantial, concrete testimony against Martin. If believed, this testimony is forceful, but the witnesses who delivered it had backgrounds and an incentive to lie that put a question mark on their credibility. Wooten, a law enforcement officer with no

similar question mark (at least as of the trial) also gave substantial concrete testimony against Martin. How much relative weight might the jury have placed on Wooten as opposed to the cooperating witnesses?

This concern is resolved by considering one more important witness. Martin himself took the stand.

Martin admitted a relationship with Claiborne. He said he had known Claiborne all his life, describing their adult relationship as built around car racing. Martin said he worked on Claiborne's cars for money. He stated that he knew Claiborne was a drug dealer during the period of the alleged conspiracy, but denied that he himself ever dealt drugs.

Martin tried to explain his lifestyle with little success. He called himself an "alley mechanic," meaning he fixed cars in alleys, on the streets—wherever he found them if someone would pay him. He also suggested that he made money by betting on auto racing. He acknowledged that he applied for general assistance or public aid in 1986. In contrast with his ostensibly limited income, Martin stipulated that he paid for a house with $44,000 in cash, all twenty dollar bills, which he carried to the closing in a shoebox. Martin claimed to have found the money concealed in one of Claiborne's cars, and maintained that Claiborne never confronted him about it. Martin admitted to driving and parking at his townhouse a Blazer, a Mercedes, a Corvette, and a motorcycle, although he weakly denied owning any of them but the Blazer. Martin agreed that he had made a $9,800 down payment on the Blazer and then financed the rest. He maintained that someone besides him wrote in the figure of $18,000 annual salary that appeared on his financing application. He admitted to twenty-three visits to a safe deposit box in a six-month period.

Martin tried with little success to soften his ostensibly evasive behavior. In explaining surveillance observations that he

drove fast and evasively, Martin stated that he was just using city streets to practice for his races at an actual track. In explaining surveillance of him frequently using various public phones near his home, Martin discounted the notion that he was evading wiretaps, stating that his girlfriend had caught him cheating, forbidden him to use the home phone which was in her name, and unplugged it. Martin also perhaps let slip that he knew Claiborne's phone was tapped. He further said that he hid and did not immediately surrender when he learned he was indicted because he was confused and scared. He admitted to avoiding two men he believed to be federal agents near his girlfriend's house. Martin conceded that he obtained drivers' licenses and a state I.D. that were phony.

Martin professed ignorance of drug dealing in his own neighborhood and the lives of those close to him. He said he did not know whether his sometimes live-in girlfriend was on public aid, or whether she worked for pay for his father. He claimed to not remember when his sisters and half-brother were arrested on drug charges. He maintained that he never noticed what the Government effectively colored as rampant drug dealing in the 44th and Greenwood area, although he had lived and worked in the area and had family there.

Martin constantly repeated the AUSA's questions, as if buying time to think up a plausible answer. Overall, he displayed an evasive and arrogant demeanor on the stand as the Court recalls from presiding over the trial.

Although Wooten's testimony was powerful against Martin, so was Martin's own performance as a witness. Martin appeared like a guilty person trying to outsmart the Government. Upon considering the testimony of the cooperating witnesses together with Martin's own testimony, the Court's confidence in the outcome with respect to Martin is not undermined by Wooten's theft.

Christopher Epison was convicted of one count of conspiracy (21 U.S.C. § 846). Eula Scott testified that Epison started out working on cars for Claiborne, and that Epison sometimes took her shopping. She once heard Claiborne ask Epison to deliver an "eight ball" (slang for a certain amount of cocaine) to a gas station or a restaurant. Scott said Epison left after this request, but she did not say whether or how Epison answered it. On other occasions, Scott heard Claiborne ask Epison to deliver unidentified packages. One time, Claiborne sent Epison to meet someone, and on the way the police pulled Epison's truck over and took a bag containing $30,000 off the seat. On another occasion, Claiborne told Epison about money not being "what it was supposed to have been," and mentioned that a package in the garage of Claiborne's residence had been moved. Later, Epison told Claiborne that he had moved the package. Scott said she understood the package to contain drugs.

Officer Brady testified that he saw Epison exit an apartment in Calumet City, Illinois frequented by Claiborne and then get into a car that bore license plates he had seen on various cars parked at Claiborne's residences, the plates apparently having been transferred from car to car. Epison drove a few blocks, entered a parking lot, and pulled up next to another car. Epison and a person in the other car then tossed unidentified packages to each other through open windows. The next day, Officer Brady saw Epison in the parking lot of the same Calumet City apartment building from the day before. A car carrier with a car on it was in the lot. Epison looked in the car for something, yelled up to the balcony that he could not find it, and Claiborne yelled back that it was there. Epison then asked co-Defendant Gary Igert to help look. Igert got in the car, appeared to look under the dashboard, got back out, then yelled up, "We are straight now." Igert gave Epison some money, then Igert drove the car and car carrier to Michigan. Brady followed the car to

Michigan, where he saw Igert take a plastic bag out of the car and carry it into a house. Probst essentially corroborated this testimony. Wooten did as well, except that he said he did not go along to Michigan.

Finally, Wooten and Kress testified about how cocaine residue was found in trash handled by Epison. Wooten said he saw Epison arrive at the Calumet City apartment building, have someone throw keys down to him, enter, and then leave a short while later. Epison was carrying two bags, which he threw into a dumpster. Wooten retrieved the bags, one of which contained smaller "baggies" that themselves contained cocaine residue. Kress testified to working with Wooten during this incident, and gave a similar although not identical account of what happened. Only Wooten, however, identified Epison as the man who threw the bags into the dumpster; Kress was unable to corroborate the identification.

As a whole, the evidence against Epison was circumstantial. Also, the evidence came in part from Scott, a perhaps inherently suspect cooperating witness. Still, the circumstantial picture was strong, with a number of independent acts and episodes portraying Epison as "bag man" and all around "gofer" for Claiborne and his conspiracy.

The only uncorroborated evidence Wooten supplied was that about the trash. Only Wooten identified Epison as the man who threw it in the dumpster. However, taking this evidence out of the picture does not prompt a new trial. Nothing showed that Epison was even aware of the contents of the trash, let alone that he put the residue-carrying baggies in the trash. Also, the cocaine was mere residue that could suggest personal drug use as much as drug dealing. Wooten's testimony about the trash evidence was a small link in an otherwise substantial chain of circumstantial evidence. The Court's confidence in the outcome against Epison is not undermined.

Stanley Wright was convicted of one count of conspiracy and four distribution counts, two of which involved distribution within one thousand feet of a school. (21 U.S.C. §§ 841, 846 and 845a). Some evidence against Wright came from cooperating witnesses. According to Legghette and Collins, Wright purchased cocaine from the Claiborne organization and sold it on the street in the area of 44th and Greenwood. According to Collins, Wright, the half-brother of Larry Martin, sometimes worked for Martin and sometimes sold his own cocaine. According to Legghette, Wright would page Legghette when he needed cocaine, and Legghette delivered one ounce of cocaine two to three times a week at various locations.

In addition to testimony from cooperating offenders, three Chicago police officers testified that Wright sold them crack cocaine multiple times on different dates, including two sales near a school.

Wright does not point to any testimony by Wooten that implicated him individually. The disclosure of Wooten's theft does not undermine confidence in the outcome against Wright.

Carlos Curry was convicted of one count of conspiracy, one count of using a communication facility in the commission of drug crime, and one count of possessing cocaine with intent to distribute (21 U.S.C. sections 841, 843(b), 846). Scott testified that Curry transported drugs and money for Claiborne. Shoring up any lack of credibility in Scott's testimony, Curry's voice and name appeared many times in wiretapped phone conversations made to or from Claiborne's residences concerning drug dealing. Curry has not identified any testimony from Wooten that implicated him. The Court's confidence in the outcome is not undermined with respect to Curry.

Deral Willis was convicted of one count of conspiracy, three counts of using a communication facility (telephone) in the commission of a drug crime, and three counts

of possessing cocaine with intent to distribute (21 U.S.C. sections 841, 843(b) and 846). As covered exhaustively when the Court recently resentenced Willis, nearly all the evidence against him came from the wiretaps. Willis has not identified any testimony from Wooten that implicated him. Confidence in the outcome is not undermined with respect to Willis. (Willis is currently appealing his resentencing, but this Court has jurisdiction to deny his new trial motion while that appeal is pending. *United States v. Blankenship,* 970 F.2d 283, 285 (7th Cir.1992)).

Harold Williams was convicted of one count of conspiracy (21 U.S.C. section 846). According to Legghette and Collins, Williams sold drugs in the 44th and Greenwood area along with other dealers connected to Martin and Claiborne, and Legghette delivered cocaine to him in that area. According to two police officers, Williams was arrested while distributing cocaine across the street from Martin's mother's house near 44th and Greenwood. Another officer testified that on another occasion, Williams was stopped with cocaine in his car and admitted it was his. For his part, Wooten testified that on one occasion he saw Williams get into a car and drive away from Claiborne's residence in Dolton, Illinois. Probst likewise testified to seeing Williams at the residence and his vehicles parked there several times. Thus, Wooten's testimony was corroborated by Probst. *See United States v. Gonzalez,* 93 F.3d 311, 316 (7th Cir.1996). The disclosure of Wooten's theft does not undermine confidence in the outcome against Williams.

## IV. *Collective Effect*

The Court may not merely examine multiple Brady violations in isolation, but must also consider their collective effect. *Kyles,* 514 U.S. at 436–37, 115 S.Ct. 1555. The only *Brady* evidence deemed admissible in this ruling is Castillo's continued drug use and Wooten's theft. Considering this evidence in combination does not change the picture of Defendants' factual guilt. The effect of Wooten's theft on factual guilt was explored above by discounting Wooten's testimony. But the Court did not discount Castillo's testimony, given that the evidence of his continued drug use was impeaching, and that he was already thoroughly impeached. So, adding the Castillo evidence to the Wooten evidence does not produce any collective effect on the picture of Defendants' factual guilt presented at trial.

█ Indeed, Defendants do not offer any conscientious argument regarding the collective effect on factual guilt. Rather, they argue that the collective effect is to cast doubt on the integrity of the Government's case because one of its witnesses was a thief and another lied under oath. Wooten and Castillo certainly are not flattering players for the Government. Yet the Court does not accept, as Defendants seem to suggest, that the jury reasonably would have ignored the picture of factual guilt and acquitted Defendants in reaction to the character of the Government's witnesses. The jurors were instructed that it was their duty to determine the facts from the evidence, that they should not be influenced by personal feelings, and that their sole interest was to determine whether the Government had proved its case beyond a reasonable doubt. As much as it may serve a party for a jury to "make a statement" of protest with its verdict, a jury that does so steps outside its proper role of considering the evidence, following the law given by the judge, and determining whether the prosecution has proved its case. *See United States v. Bruce,* 109 F.3d 323, 327 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 113, 139 L.Ed.2d 66 (1997) (noting that jury nullification is an aberration in the criminal justice system). Any collective effect of the new evidence regarding Wooten and Castillo does not undermine confidence in the outcome. As for any collective effect under the non-*Brady* new trial tests applied in this order, the result is the same.

### V. *Requests for a Hearing*

Several Defendants state that an evidentiary hearing is needed on some or all of the issues they raise. Defendants have had roughly two years to prepare and refine their new trial motions. During that time they have conducted considerable discovery and won favorable discovery rulings. After all this, an evidentiary hearing would amount to a fishing expedition. The Court will not hold an evidentiary hearing. *See United States v. Taglia*, 922 F.2d 413, 419 (7th Cir.1991) ("[I]f there is no reason to suppose that a hearing would produce evidence justifying the grant of a new trial, there is no reason to hold a hearing.").

### VI. *Other Motions and Matters*

After he filed his motion for a new trial, the pro se Willis filed several motions that need be addressed. In the first he asks to amend his motion for new trial on the ground that the Government delayed in providing him with transcripts of depositions in Probst's civil case. Those transcripts are and have been available in the public record, as the Government notified Willis through his former counsel in 1996. Willis now complains that the transcripts are partially redacted, but he has been on notice of that since 1996 and never complained about it before. No other Defendant has raised an objection about the redactions in the transcripts. This motion is **DENIED**. Willis' next motion asks the Court to grant his new trial motion because the Government did not respond to the motion on time. The Government did respond on time; this motion is also **DENIED**. Willis' final motion asks for permission to adopt Epison's memorandum and exhibits. This motion is in keeping with the limits on such adoption the Court set earlier, and therefore is **GRANTED**.

Stanley Wright and Harold Williams remain to be resentenced per the Seventh Circuit's remand. This Court has held off on the resentencings at *Defendants'* request while the new trial motions have been developed and pending. With those motions now resolved, there is no reason to delay resentencing. The Government shall have up to thirty days from the date of this order to submit its position on resentencing for Wright and Williams. Defendants shall have up to twenty days thereafter to submit their positions. After receiving the parties' submissions, the Court will set dates for the resentencings. (Any party who wishes to rely on a previous submission on resentencing must file a statement to that effect and provide the Court with a courtesy copy of the previous submission.)

In closing, the Court emphasizes that this ruling should in no way be interpreted as an endorsement of Wooten's theft and Castillo's false testimony. Those acts were serious misdeeds of a type that may undermine the integrity of the prosecution and the judicial process. Nevertheless, granting a new trial is not the necessary or proper response.

### *CONCLUSION*

For the foregoing reasons: (1) the Amended Motion for New Trial filed by Defendant, Carlos Curry, is **DENIED**; (2) Christopher Epison's Rule 33 Motion for New Trial, is **DENIED**; (3) the Second Amended Motion for New Trial filed by Defendant, Larry Martin, is **DENIED**; (4) the Motion for New Trial filed by Defendant, Harold Williams, is **DENIED**; (5) the Motion for New Trial or Evidentiary Hering filed by Defendant, Deral Willis, is **DENIED**; (6) the Motion for New Trial filed by Defendant, Stanley Wright, is **DENIED**; (7) Defendant's Motion for Extension of Time Due to Government's Failure to Comply With Court's Order, filed by Defendant, Deral Willis, is **DENIED**; (8) Defendant's Motion Concerning Government's Response, filed by Defendant, Deral Willis, is **DENIED**; and (9) Defendant's Request to Adopt Epison's Memorandum of Law/Appendix of Exhibits, filed by Defendant, Deral Willis, is **GRANTED**. In addition, deadlines for submissions on re-

sentencing of Defendants, Stanley Wright and Harold Williams, are set herein.