**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Pedro SILVA and Rodolfo Baydoun,
Defendants–Appellants.**

Nos. 94–2229, 94–2245.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 29, 1995.

Decided Dec. 4, 1995.

---

Barry Rand Elden, Chief of Appeals, George Jackson, III (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for United States of America.

Joseph R. Lopez (argued), Chicago, IL, for Pedro Silva.

Guillermo F. Martinez, Joseph Lopez (argued), Chicago, IL, for Rodolfo Baydoun.

Before POSNER, Chief Judge, and KANNE and DIANE P. WOOD, Circuit Judges.

KANNE, Circuit Judge.

After a trial by jury, defendants Pedro Silva and Rodolfo Baydoun were convicted of various drug offenses. Silva subsequently filed a motion for a new trial, arguing that the prosecution's failure to voluntarily disclose the identity and background of one of its confidential informants had violated his right to due process. The district court denied the motion upon finding that the undisclosed information was not material, and we affirm.

## I. HISTORY

On a summer afternoon in Chicago, a man walked into Pedro's Auto Repair Shop and asked to speak with the owner, defendant Pedro Silva. Upon meeting Silva, the man identified himself as Miguel Gonzalez and explained that he was looking for someone there named Ancelmo, with whom he said he had previously conducted some business. Silva told Gonzalez that Ancelmo had returned to Mexico in order to avoid the police, but assured him that he could talk freely and openly to Silva about any business he had conducted with Ancelmo. Gonzalez informed Silva that he had purchased kilogram quantities of cocaine from Ancelmo in the past and that he now wished to purchase three kilograms more. Silva claimed to have retired from the drug trade, but he said he still had his contacts and he could arrange to get Gonzalez the cocaine for $29,500 per kilogram. Gonzalez gave Silva his beeper number, and Silva agreed to contact him after investigating his background. Silva never called.

Two weeks later, Gonzalez returned to the repair shop along with his cousin and $58,000 in cash. Gonzalez went into the shop and told Silva that he had brought the cash with him to purchase approximately two kilo-

grams of cocaine. Silva initially expressed reluctance because he said he had called Ancelmo, and Ancelmo had never heard of Miguel Gonzalez. But throwing caution to the wind, Silva nevertheless agreed to arrange for the transaction. After asking to see the money, Silva told Gonzalez and his cousin to leave the shop and wait to be contacted, which they did.

That evening, Silva paged Gonzalez on his electronic beeper. When Gonzalez returned the call, Silva gave him an address and instructed him to go there. Gonzalez and his cousin drove to the designated location. There they met with Silva, and after some negotiation it was decided that only Silva and Gonzalez's cousin (who supposedly was the true purchaser) would leave to make the cocaine purchase. While Gonzalez stayed behind, Silva and Gonzalez's cousin returned to the auto repair shop where Silva explained that the deal was for one kilogram only. If the transaction proceeded without incident, Silva promised that Gonzalez's cousin would be able to purchase as many kilograms as he wished to in the future. Silva then dialed an electronic pager number belonging to defendant Rodolfo Baydoun.

A few minutes later, Baydoun drove into the parking lot of the shop. After speaking with Baydoun, Silva became alarmed when he noticed the presence of a nearby surveillance vehicle. His fears were not unwarranted; there were several Drug Enforcement Administration vehicles surrounding the location. Much to Silva's dismay, Gonzalez's cousin was in fact Special Agent Rafael Tovar of the Northeastern Metropolitan Enforcement Group, and "Miguel Gonzalez" was actually a confidential informant working in conjunction with the DEA under an assumed name. Special Agent Tovar gave the arrest signal, and Silva was instantly apprehended.

Baydoun attempted to speed from the scene, but several blocks away his car was struck by an oncoming train as he attempted to negotiate around the lowered gates of a railroad crossing. After the collision, his car was unable to travel any faster than ten miles per hour, and pursuing agents quickly caught up to him. While driving slowly, Baydoun threw a paper bag containing one kilogram of cocaine out of the open driver's side window. Immediately thereafter, Baydoun was stopped and arrested, and the bag was recovered.

Silva and Baydoun were each charged with one count of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and with one count of conspiracy to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846.

Prior to trial, Silva made a motion requesting disclosure of information about the confidential informant who had called himself Miguel Gonzalez. The district court granted the request, and the government identified the informant as Sergio Garcia. Both defendants were given Garcia's background information and his signed statement.

In the first paragraph of his statement, Garcia recounts the morning of the day he first visited Pedro's Auto Repair Shop. Garcia describes how he met at the DEA's Chicago office with several DEA agents and with another confidential informant who was cooperating with the DEA. According to Garcia, the other informant tipped them off to an automobile repair shop operated by Pedro Silva where large quantities of cocaine were sold on a regular basis, and he offered that the names of Ancelmo and Ancelmo's brother Zacarias could be safely used as references. Even after receiving Garcia's signed statement, however, neither Silva nor Baydoun ever requested the identity of, or any information about, this other informant.

Silva and Baydoun both pleaded not guilty. At trial, Silva raised the defense of entrapment, while Baydoun denied ever possessing any cocaine. Despite their asserted defenses, the jury found them both guilty as charged on all counts.

Between trial and sentencing, the defendants learned that the other informant with whom Garcia had initially met was a man named Tony Varela.[1] They further discover-

1. Apparently, Silva's attorney initially discovered Varela's identity when he noticed that the confidential informant identification number used in this case to denote the "other informant" was

ed that in addition to working with the DEA as a condition to a plea agreement, Varela was a murder suspect with an extensive criminal history, including involvement in armed robbery, burglary, counterfeiting, and numerous major drug transactions.

Silva filed a motion for a new trial, arguing that under *Brady v. State of Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government's failure to disclose Varela's identity and background had violated his right to due process. The district court denied his motion after determining that the undisclosed evidence was immaterial to any issue at trial. Both defendants appeal.

## II. ANALYSIS

### A. Silva's Appeal

■ In order to mount a successful *Brady* challenge, a defendant must establish the following: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial. *United States v. White,* 970 F.2d 328, 337 (7th Cir.1992); *United States v. Hartmann,* 958 F.2d 774, 790 (7th Cir.1992). Evidence is material only if there exists a "reasonable probability" that its disclosure to the defense would have changed the result of the trial. *Kyles v. Whitley,* —— U.S. ——, ——, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995); *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *United States v. Boyd,* 55 F.3d 239, 245 (7th Cir.1995). However, this standard does not require the defendant to prove that it is more likely than not that disclosure of the evidence would result in acquittal. *Kyles,* —— U.S. at ——, 115 S.Ct. at 1566. A reasonable probability of a changed result exists where the suppression of evidence "undermines confidence in the outcome of the trial." *Id.* (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381).

■ Of course, the effect that a particular piece of evidence is likely to have had on the

outcome of a trial must be determined in light of the full context of the weight and credibility of all evidence actually presented at trial. Having personally observed the entire proceeding, the district court judge is best positioned to make this determination. As a result, we review the district court's denial of Silva's motion on the grounds of materiality only for an abuse of discretion. *Boyd,* 55 F.3d at 242; *United States v. Kozinski,* 16 F.3d 795, 818 (7th Cir.1994).

■ Silva maintains that disclosure of Varela's identity and background might have aided his entrapment defense and thus changed the trial's outcome. In support of this argument, he offers two ways in which he would have used the evidence to demonstrate entrapment.

■ First, Silva contends that he would have attacked Varela's sordid past. While it is true that suppression of evidence relevant only for impeachment purposes can still give rise to a *Brady* violation, *Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), evidence that would not have been admissible at trial is immaterial because it could not have affected the trial's outcome. *See United States v. Veras,* 51 F.3d 1365, 1375 (7th Cir.1995); *United States v. Dimas,* 3 F.3d 1015, 1019 (7th Cir.1993). Here Varela was not called to testify at trial by either party. His statements were never offered into evidence. None of the prosecution's evidence depended in any way upon the veracity of his information. Instead, Varela's statements were not unlike the suggestions of an anonymous tipster: such suggestions serve only to initiate a criminal investigation that produces evidence against the defendant, but they generally are not used as evidence themselves. Notwithstanding Silva's assertion to this court at oral argument that "a confidential informant with a sordid history like Tony Varela is always beneficial to the defense in front of a jury," the unsavory nature of an informant is not admissible into evidence merely to make the prosecution appear dissolute by association.

identical to the identification number used in another case where Varela's identity had been properly disclosed. Varela's identity and history were later confirmed when, on November 22,

1993, the Chicago Tribune published an article that specifically discussed Tony Varela, his background, and his involvement with the DEA.

Varela's credibility was not at issue in this trial, and thus evidence to impeach him would have been irrelevant and consequently inadmissible. See FED.R.EVID. 401–02; *United States v. McClain*, 934 F.2d 822, 832 (7th Cir.1991) (holding that where an individual did not present testimony damaging to the defendant, his character was not at issue, and therefore questioning him for impeachment was precluded as irrelevant).

Secondly, Silva argues that Varela's *direct* testimony would have supported his entrapment defense. Now that Varela's identity has been revealed, Silva is certainly aware of any prior dealings between them and of what Varela might testify to. Yet Silva does not articulate one shred of beneficial testimony that could be expected from Varela. Silva expresses only a vague hope that Varela's testimony might establish that Silva was retired and somehow uncover the impropriety of how and why Silva was allegedly lured out of retirement. But in fact, the only indications of Varela's probable testimony are his statements to the DEA concerning the high volume of cocaine traffic through Silva's own repair shop—hardly evidence of Silva's lack of predisposition to commit his crimes.

Thus, neither of Silva's arguments demonstrates a "reasonable probability" that disclosure of Varela's identity would have supported entrapment and therefore changed the trial's outcome. Varela's history would have been inadmissible for impeachment purposes, and it is unclear how Varela's direct testimony would have supported Silva's entrapment defense. As a result, we cannot say the district court abused its discretion by denying Silva's motion for a new trial.

B. Baydoun's Appeal

Rodolfo Baydoun did not file a separate brief in this appeal, but instead adopted Silva's brief and consequently Silva's arguments. Silva's entire basis for appeal, however, was that disclosure of Varela's identity and background would have supported his *entrapment* defense and thereby changed the outcome of the trial. Baydoun never raised an entrapment defense at trial. Therefore, his failure to file a brief developing how Varela's testimony might have specifically aided in his defense renders his appeal wholly without merit.

The convictions of Pedro Silva and Rodolfo Baydoun are AFFIRMED.