In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3223

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHAWN W. BLAND,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 05 CR 30050—**Jeanne E. Scott**, *Judge.*

ARGUED MARCH 26, 2007—DECIDED FEBRUARY 25, 2008

Before ROVNER, WILLIAMS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* After a jury found him guilty of armed bank robbery and using a firearm during that offense, Shawn Bland was sentenced to consecutive terms of 63 and 84 months' imprisonment. On appeal, Bland argues he is entitled to a new trial because the government failed to disclose potential *Brady* materials until after his trial. Bland also faults the district court for not conducting an independent in camera review of these materials and instead simply accepting the government's characterization of their contents. Because Bland has not established that the government committed a *Brady* violation and the district court had no independent duty to review the putative *Brady* materials, we affirm.

## I.  Background

On the morning of March 24, 2005, Vania Anderson, a teller at the National City Bank in Springfield, Illinois, saw an African-American male walk into the bank wearing a gray hooded sweatshirt with the hood pulled tightly around his face. The man produced a small black handgun and announced he was robbing the place. The robber tossed a black bag over the teller counter at Stacy Huntington, another teller. As Huntington bent down to pick up the bag, the robber warned her not to trigger any alarms. The robber then ordered two other bank employees, Wendy Friedrich and Linda Brown, to come out of their offices, presumably so he could keep an eye on them. As he had with Huntington, the robber warned them not to set off any alarms. Once Brown was out of her office, the robber pulled the slide of the gun back, emphasizing he was ready to use it.

Brown, who was the bank's office manager, told the other employees to follow the robber's instructions. While the other employees held their hands up where the robber could see them, Huntington emptied her cash drawer into the black bag before handing it to Anderson, who did the same with her drawer. The robber then took back his bag, now filled with cash, and asked if there was a vault. Brown responded that the employee with access to the vault had not yet arrived for the day. When the robber asked where the back exit of the bank was, Brown said that door was locked. She explained that the keys were in her pocket, but said she would need to lower her hands to get them. Apparently dissatisfied with this answer or simply not wanting to remain in the bank any longer, the robber made his getaway through the bank's front door, escaping with over $4500 in cash. With the robber gone, Brown locked the bank's doors, and Huntington and Anderson set off alarms. Janet Moser, a customer sitting in her car outside the bank, sensed

something was amiss inside the bank and followed the robber for a few blocks before eventually losing sight of him. The police arrived at the bank within five minutes.

A crime technician with the Springfield Police Department lifted a partial palm print, a hand heel print, and some fingerprints from the inside surface of the bank's front doors. Testimony at trial established that those doors were cleaned nightly by housekeeping. The prints were later identified as Bland's. Eyewitnesses Friedrich, Brown, and Huntington were interviewed by FBI Special Agent Terrence Moody; Janet Moser was interviewed by the Springfield police. A week or two later, Agent Moody and another FBI Special Agent, Chris Pyle, presented a photo array containing Bland's photo to Anderson, Friedrich, and Huntington. Anderson and Friedrich identified Bland as the robber; Huntington identified a different person.

In the meantime, three days after the robbery, Bland was arrested for driving on a suspended license, and a search of his car turned up a small black handgun. Bank employees later identified the gun as similar to the one used in the robbery. Bland was detained on state charges in the Logan County Jail; while there, he made several taped telephone calls in which he referred to giving his sister $4000 to hold for him. On April 2, 2005, Springfield Detective James Graham and Special Agent Moody conducted a videotaped interview of Bland. Bland initially denied having been at the bank on the day of the robbery; he later admitted being in the bank, but only to obtain penny rolls for his mother. Bank employees said that no one had come to the bank asking for penny rolls on the day—or even the week—of the robbery. During the videotaped interview, Graham used various ruses and false statements—e.g., falsely telling Bland that the police found marked bills in Bland's personal belongings. Bland was interviewed a second time on April 7, this time by FBI Agents Moody and Pyle.

On June 2, 2005, a grand jury indicted Bland on one count of armed bank robbery, 18 U.S.C. § 2113(a) and (d), one count of carrying and using a firearm during a crime of violence, 18 U.S.C. § 924(c)(1), and one count of possession of a firearm by a convicted felon, 18 U.S.C. §§ 922(g) and 924(a)(2). The district court granted Bland's motion to sever the possession count, and a jury trial on the bank robbery and § 924(c) counts commenced on December 5, 2005.

The basic sequence of events comprising the robbery was uncontested at trial; the central issue was identification. Some of the eyewitness testimony on that point was inconsistent. Anderson thought the robber had a thin mustache, Huntington thought he had a goatee, and Brown said he was clean-shaven. Anderson identified Bland as the robber both in the photo lineup and in court. Friedrich, though confident she had correctly identified the robber previously in the photo array, could not say at trial that Bland was definitely the robber. Huntington, who had picked someone else from the photo array, positively identified Bland in court as the robber.

Bland's girlfriend, Candice Burton, also testified at trial to explain her activities with Bland on the day of the crime. She said Bland accompanied her to a dental appointment in the morning but left, ostensibly to get his car jumped. When Bland rejoined her later at his mother's house, she heard him tell his sister that he wanted her to "put some money up" for him. Burton also testified that she and Bland went shopping later that day with Bland's sister. Although he was unemployed, Bland gave his sister and Burton $200 apiece, in $100 bills, to spend. He also paid cash for clothing and Air Jordan basketball shoes for himself. Detective Graham also testified at trial, among other law enforcement witnesses. He authenticated the videotape of the interview he and

Special Agent Moody conducted of Bland, and admitted to using lies and other ruses during that interview.

The jury returned verdicts of guilty on both counts. On January 19, 2006, before Bland was sentenced, a local newspaper ran an article reporting that the Illinois State Police were investigating allegations of misconduct against Detective Graham involving three cases in 1999 and another in 1994. The 1994 case purportedly involved his withholding of interview reports and intimidating a witness in a murder case. Alerted to this information, the Assistant U.S. Attorney responsible for Bland's case sent a letter dated January 23, 2006, to the Springfield Police Department requesting the investigative files related to Graham. The materials (eventually numbering over 4000 pages) were reviewed by the Assistant U.S. Attorney, and on May 1, 2006, the government filed a disclosure statement advising the district court that the files contained no *Brady* material and therefore did not warrant in camera review. The court invited a response from Bland, but he did not respond. He did not request to examine the materials, ask the court to review the files in camera, or move for a new trial. The district court then entered an order directing the government to disclose any material relating to Bland or his case. Beyond that, however, the court said no further action regarding the files was required, in light of "the substantial evidence of Defendant's guilt presented at trial" and the fact that "other evidence corroborated Detective Graham's testimony."

The government responded that none of the materials in the Graham misconduct investigation concerned Bland or the bank robbery for which he stood convicted. The case then proceeded to sentencing. Bland was sentenced to a total of 147 months' imprisonment—63 months for the bank robbery and 84 months consecutive for

carrying and using a firearm during a crime of violence. Bland appeals.

## II. Discussion

Bland's appeal asserts a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), in connection with the government's posttrial disclosure of the misconduct investigation regarding Detective Graham. Because Bland did not claim a *Brady* violation or otherwise respond to the government's disclosure in the district court, we review his *Brady* claim for plain error. *United States v. Barker*, 467 F.3d 625, 629 (7th Cir. 2006) (citing *United States v. Stott*, 245 F.3d 890, 900 (7th Cir. 2001)).

Brady set forth the now familiar principle that "the government has the affirmative duty to disclose evidence favorable to a defendant and material either to guilt or punishment." *United States v. Fallon*, 348 F.3d 248, 251 (7th Cir. 2003). A successful *Brady* challenge requires a defendant to show "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995) (citing *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) & *United States v. Hartmann*, 958 F.2d 774, 790 (7th Cir. 1992)). Evidence is material if "there exists a 'reasonable probability' that its disclosure to the defense would have changed the result of the trial." *Silva*, 71 F.3d at 670 (citing *Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985) & *United States v. Boyd*, 55 F.3d 239, 245 (7th Cir. 1995)). The prosecution has "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. The government's *Brady* obligation encompasses

impeachment evidence. *United States v. Dabney,* 498 F.3d 455, 459 (7th Cir. 2007).

Bland contends he should receive a new trial because the government suppressed the materials relating to Graham's misconduct investigation that could have been used to impeach Graham and the investigative methods used by the Springfield Police Department. There is no dispute that the first two elements of a *Brady* violation are present here: the government admits it should have known about and disclosed the Graham misconduct investigation prior to trial, and also concedes its potential relevance for impeachment purposes. *See Ienco v. Angarone,* 429 F.3d 680, 683 (7th Cir. 2005) (evidence is "suppressed" within the meaning of *Brady* if "the prosecution failed to disclose the evidence in time for the defendant to make use of it, and . . . the evidence was not otherwise available to the defendant through the exercise of reasonable diligence"); *United States v. Baker,* 453 F.3d 419, 422 (7th Cir. 2006) ("Evidence favorable to a defendant includes . . . impeachment . . . evidence."). The central issue in this appeal concerns whether the Graham misconduct files were material to an issue at Bland's trial. They were not.

First, even assuming the files would have undermined Graham's credibility, Graham's testimony—a mere 11 pages of the trial transcript—was limited to summarizing what was said during the videotaped interview he and Moody conducted with Bland. The videotape itself was the best evidence of the contents of the interview, and it fully corroborated Graham's summary testimony. Bland stipulated to the accuracy of the videotape and did not object to its admission into evidence; he never claimed Graham coerced him into making a statement. The statement was largely exculpatory in any event; Bland denied being at the bank, and later said he had been there, but only to pick up penny rolls. Graham had no contact with any other witnesses in Bland's case. Graham's

testimony played such a small role in the trial that it was immaterial whether the jury might have discredited it based on evidence from the misconduct investigation. There is nothing to suggest that the misconduct investigation encompassed Graham's limited participation in Bland's case.

Moreover, the evidence of Bland's guilt was overwhelming: (1) Bland's palm and fingerprints were found on the door through which the robber left the bank; (2) Bland's videotaped statement reveals that he changed his story about going to the bank, and the version he settled on was implausible in light of other evidence; (3) Bland was found three days after the robbery in possession of a gun witnesses identified as similar to the one used in the robbery; (4) two tellers identified Bland in a photo lineup and at trial; (5) Bland, who was unemployed, had a significant amount of money to spend after the robbery; and (6) after the robbery, Bland was overheard on several occasions saying he had given his sister money to hold for him. In short, it is not reasonably probable that evidence relating to Graham's misconduct investigation would have changed the trial's outcome. *United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."); *Silva*, 71 F.3d at 670.

Bland also asserts that the district court was obligated to conduct an independent examination of the purported *Brady* materials rather than rely on the government's representations regarding their materiality. He invites us to fashion a rule requiring the district court to conduct an independent *Brady* review of the government's files and asks us to remand the case for an in camera examination of Graham's misconduct files. We decline to do so.

It is well-established that the decision whether to review purported *Brady* materials in camera is entrusted to the district court's sound discretion, *see United States v. Phillips*, 854 F.2d 273, 277 (7th Cir. 1988) (citing *United States v. Valona*, 834 F.2d 1334, 1341 (7th Cir. 1987) ("Generally, the decision[ ] whether to conduct an *in camera* review of government files . . . [is] committed to the sound discretion of the district judge.")), and mere speculation that a government file might contain *Brady* material is not sufficient, *United States v. Mitchell,* 178 F.3d 904, 907 (7th Cir. 1999); *United States v. Navarro*, 737 F.2d 625, 631 (7th Cir. 1984). The district court is under no general independent duty to review government files for potential *Brady* material. *Dabney,* 498 F. 3d at 459; *Mitchell,* 178 F.3d at 908; *see also United States v. Hernandez,* 31 F.3d 354, 361 (6th Cir. 1994) (absent some indication of misconduct by the government, the district court is not required to conduct an in camera review to verify government's assertions as to materiality under *Brady*); *but see United States v. Kiszewski,* 877 F.2d 210, 216 (2d Cir. 1989) (court should not rely on the government's representations regarding *Brady* materiality of potential impeachment evidence where credibility is the central issue in the case).

Here, the district court did not abuse its discretion in refusing to conduct an independent in camera review of the files relating to Graham's misconduct investigation. As the court noted, Bland did not request such a review, Graham's testimony was fully corroborated by the videotape and other evidence at trial, and the evidence of Bland's guilt was substantial. Accordingly, the judgment of the district court is AFFIRMED.

USCA-02-C-0072—2-25-08