In the

# United States Court of Appeals
## for the Seventh Circuit

———————————

No. 21-3345

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LORENZO JOHNSON,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:20CR7-001 — **Philip P. Simon**, *Judge.*

———————————

ARGUED NOVEMBER 29, 2022 — DECIDED JANUARY 15, 2025

———————————

Before SYKES, *Chief Judge*, and HAMILTON and BRENNAN, *Circuit Judges*.

SYKES, *Chief Judge*. Lorenzo Johnson ran an online child-pornography scheme in which he induced destitute women to send him sexually explicit photos of their young children by promising them money. Law enforcement identified the IP address, social-media accounts, and cellphone Johnson used to carry out his scheme. Officers then searched Johnson's home and recovered his phone, which contained

evidence of the crimes; they also recovered a handgun. Johnson confessed key details of his scheme in two recorded interviews with FBI agents. A jury found him guilty of conspiracy to produce child pornography, distribution of child pornography, and unlawful possession of a firearm as a felon.

On appeal Johnson raises three claims of procedural error. First, he claims that either the magistrate judge or the district judge should have granted his requests for new counsel. He also challenges the district judge's denial of his motion for a new trial based on a late disclosure of potential *Brady/Giglio* evidence. Last, he argues that the judge made an improper factual finding at sentencing regarding his causal role in the suicide of one of the women who participated in his scheme.

We affirm. The magistrate and district judges appropriately exercised their discretion in denying Johnson's requests for new counsel. The district judge also properly denied Johnson's motion for a new trial because it was undeveloped. Finally, Johnson's claim of sentencing error is misplaced. Not everything a judge says at sentencing is a factual finding. The judge discussed the coconspirator's suicide as part of his holistic assessment of the seriousness of the crimes. His comments did not amount to a factual finding that Johnson was causally responsible.

## I. Background

The facts of Johnson's child-exploitation scheme are unsettling. But he does not challenge the jury's verdict, so a summary will suffice to put his claims of procedural error in context. We omit the disturbing details.

In January 2020 a grand jury in the Northern District of Indiana returned an indictment charging Johnson with five crimes: three counts of conspiracy to produce child pornography in violation of 18 U.S.C. § 2251(a), (e); one count of distribution of child pornography, *id.* § 2252(a)(2), (b)(1); and one count of unlawful possession of a firearm as a felon, *id.* § 922(g)(1). The charges arose out of Johnson's online child-pornography scheme in which he targeted women in dire financial straits and induced them to send him sexually explicit photos of their very young children—first by promising a quick payment of money and then by threatening to expose their involvement once they began sending him photos.

Johnson's scheme generally operated as follows: he initiated contact with the women over Facebook using an account in the name of "Ashley Campbell." Once a target responded and signaled some interest in continuing the conversation, he added his own Facebook account as an additional method of communication. He then used his cellphone to receive, store, and distribute the child pornography he solicited from his targets.

Johnson's scheme was operational for at least several months during the summer and fall of 2019. In October a woman he tried but failed to enlist in the scheme reported his activities to law enforcement. With her consent, an officer took control of her Facebook account and, impersonating her, continued the online chat Johnson had initiated. The conversation went on for several weeks as the undercover officer tried to elicit more information from Johnson about his child-pornography operation. In tandem with the online undercover investigation, forensic investigators also gath-

ered digital evidence about the IP address and Facebook accounts Johnson was using. The IP address was registered to Johnson's home in Hammond, Indiana.

When they had enough evidence, investigators obtained a search warrant for Johnson's home, where they recovered his cellphone and other evidence of the crimes, together with a Taurus .40 caliber handgun. In a recorded interview with FBI agents, Johnson confessed to key inculpatory details about the scheme, including that he had operated the "Ashley Campbell" account and that the agents would find sexually explicit photos of children on his cellphone. He also admitted that the gun found in his home was his. Because Johnson's criminal record includes an Illinois felony conviction for aggravated sexual abuse of a minor, he was required to register as a sex offender and was prohibited from possessing firearms.

Johnson's phone contained sexually explicit photos of children sent by three women between July and October 2019. The women took photos of their children's genitalia and sent them to Johnson in response to his specific requests. The children were very young—three boys (ages two, four, and six) and a girl (age one).

In a second recorded interview with FBI agents, Johnson admitted additional details about his child-pornography operation. The three charged conspiracy counts pertained to Johnson's conduct with each of the three identified women who responded to his online outreach and sent him sexually explicit photos of their children between July and October 2019. One of the women was charged as a codefendant in the indictment against Johnson in Northern District of Indiana; the other two were indicted on similar charges in the North-

ern District of Illinois. The distribution count pertained to Johnson's redistribution of the child pornography between July and December 2019.

Johnson faced enhanced penalties on the conspiracy and distribution counts based on his prior felony conviction for aggravated sexual abuse of a minor. *See* §§ 2251(e), 2252(b)(1). The case was initially set for trial in late March 2020, but the trial was postponed until mid-July and then early November 2020.

In August 2020—about eight months after Johnson was arraigned and at the height of the Covid-19 pandemic—Johnson sent a letter to the court complaining about inadequate communication from his appointed counsel Adam Tavitas. Johnson reported that he had a videoconference meeting with Tavitas in April and described his unsuccessful attempts since then to reach the attorney to discuss his case ahead of the November trial date and to request that he file a motion for home confinement because of Covid. Johnson's letter made passing reference to aspects of his defense and concluded by saying that he did not know if he could get a new lawyer or what could be done about his situation. He asked the court for help.

The magistrate judge assigned to Johnson's case struck the pro se letter and convened a telephonic status conference to address the attorney-client situation. At the hearing, the judge explained that he struck the letter because it contained some rudimentary references to Johnson's possible defense and also because Johnson was represented by counsel; the judge admonished Johnson to communicate with the court only through his appointed attorney.

The judge then asked Johnson's attorney to address the complaint about inadequate communication. Tavitas explained that several attorneys had contacted him about possibly representing Johnson, which led him to believe that his client might be hiring new counsel. Tavitas assured the magistrate judge that he and Johnson had met and worked through this misunderstanding and were now "on good terms." He added that he thought Johnson still wanted him to remain as his lawyer.

The magistrate judge then addressed Johnson directly, reiterating that he should communicate with the court through his attorney and explaining that if he wanted Tavitas to remain as his counsel, then nothing more needed to be done. The judge also said, however, that if Johnson wanted Tavitas to withdraw, then the two should discuss that option and the attorney would file an appropriate motion. After some additional discussion between Tavitas and the judge about the defense attorney's trial schedule, the judge concluded the hearing by reminding Johnson that any time he communicated directly with the court instead of through his counsel, he risked "exposing things that the Government shouldn't know," and "we don't want that." The judge also assured Johnson that Tavitas "is a very caring and experienced lawyer"—but he added that if Johnson and his attorney had "irreconcilable differences for whatever reason," then he would consider appointing another lawyer.

For the next year or so, no concerns were raised about the attorney-client relationship. In the meantime, the November trial date was postponed to February 2021 and then to April 2021, and the case was administratively reassigned to a different district judge. In March 2021 the codefendant—one

of the women who participated in Johnson's scheme—committed suicide. In early April Johnson's attorney moved to continue the trial date again. The newly assigned judge granted the motion and set a firm trial date of August 11, 2021.

On August 9—two days before trial—Tavitas moved to withdraw as Johnson's counsel. The motion was brief, saying only that Johnson had become argumentative during a meeting on August 6, and the next day had advised Tavitas that he wanted a new lawyer and a postponement of the trial date.

At a hearing on August 10, the district judge excused the prosecutor and then asked Tavitas to elaborate on the bare-bones motion. The lawyer explained that Covid-related jail restrictions had prevented him from meeting with his client as often as he would have liked since Johnson's arraignment 20 months earlier. But he said he met with Johnson at the jail at least four or five times in recent months in preparation for trial and spoke with him on the phone several times. The judge asked him to be more specific about the nature of the breakdown in the attorney-client relationship. The attorney's response was generic: Tavitas said only that Johnson was unhappy with his trial preparation but was not more specific. He also told the judge that their August 6 meeting was quite heated and might have turned physical had there not been a glass partition separating them.

The judge then asked Johnson if he had anything to say. Johnson's response was similarly nonspecific. He generally complained that Tavitas had not adequately explained why he had declined to file a suppression motion and had not shared enough information about the evidence in the case.

When asked to respond, Tavitas assured the court that he had discussed the evidence and litigation strategy with his client multiple times. Johnson also complained that Tavitas spent too much time talking about a possible plea deal even though he made clear that he didn't want one.

After a brief recess, the judge returned to the bench and denied the motion. In his oral ruling, he cited the Supreme Court's decision in *Martel v. Clair*, which identifies three primary factors to guide decisions on motions for substitute counsel: the timeliness of the motion, the adequacy of the court's inquiry into the nature of the defendant's complaint, and the asserted grounds for the motion, including the nature and extent of the conflict or communication break-down between lawyer and client. 565 U.S. 648, 663 (2012). Starting with the timeliness question, the judge noted the obvious: the motion was filed on the eve of trial, which weighed heavily against granting it. Regarding the adequacy of his inquiry into the reasons for the motion, the judge explained for the record that he had just spent 30–35 minutes "delving into the nature of [Johnson's] complaint," implicitly concluding that this level of consideration was adequate under the circumstances.

Regarding the third and final factor, the judge was un-convinced that there was any real breakdown in communi-cation between lawyer and client—and certainly no indication of a conflict serious enough to warrant appoint-ment of new counsel and adjournment of the trial. The judge emphasized that Tavitas had met with Johnson "many, many times" and that they had reviewed the relevant evi-dence and information about the case. Though the two had recently "argue[d]" and it got "heated at times," the judge

explained that "clashes in personality are an insufficient basis to merit a substitution of counsel." Citing circuit caselaw—specifically, *United States v. Volpentesta*, 727 F.3d 666 (7th Cir. 2013)—the judge observed that "butting heads does not equal a total breakdown in communication," and "simply disagreeing does not mean you're failing to communicate." With all relevant factors weighing against Johnson's request, the judge denied the motion and said the trial would proceed the next day as planned.

The defense strategy at trial centered on a contention that law enforcement should have investigated other suspects who might have been operating the "Ashley Campbell" Facebook account—in particular, someone named Alonzo Brandon, whom Johnson had mentioned in his first FBI interview as another person who had access to the account. The defense also emphasized that the two principal FBI case agents had declined to investigate an unidentified woman who was in Johnson's home at the time of the search.

The jury convicted Johnson on all counts. Two weeks before sentencing, the prosecutor filed an ex parte motion for a protective order explaining that she had recently learned of a romantic relationship between the two principal FBI case agents. The motion noted that the government had asked the agents before they testified if they had any relationships with other witnesses that could be viewed as undermining their objectivity or improperly influencing their testimony. Neither agent mentioned their romantic relationship at that time. When it came to light after the trial, both agents assured the prosecutor that the relationship had not affected their objectivity or influenced their testimony.

The prosecutor asked the court to seal the motion and enter a protective order so that she could disclose this newly acquired information to the defense without unnecessary burden on the agents' privacy interests. The motion also noted the government's position that the belated disclosure of this potential *Giglio* evidence[1] was not prejudicial because the information likely would have been excluded as irrelevant and not a proper basis for cross-examination. The judge sealed the motion, entered the requested protective order, and directed the government to disclose the new information to Johnson's counsel.

At the beginning of the sentencing hearing, the judge briefly addressed the matter and asked the defense attorney to confirm that he had received the sealed information from the government. Tavitas replied that he had, adding that he had discussed it with his client, who instructed him to orally move for a new trial based on the government's belated disclosure. The judge pressed Tavitas to explain the materiality of the new information—more particularly, how it could have been used during cross-examination of the FBI agents. The attorney declined to be more specific. He said only that he had given Johnson his opinion on the potential admissibility of the new information, and that Johnson had asked him to move for a new trial "even after" hearing his opinion.

The judge denied the motion as undeveloped, explaining that it was "barebones" and the defense had not explained how the new information would have been relevant or material to the cross-examination of the agents. In the

---

[1] *Giglio v. United States*, 405 U.S. 150 (1972).

judge's view, the new information seemed "entirely irrelevant to anything that took place during this trial."

Before moving on, we note one additional development at sentencing that bears on this appeal. In its sentencing memorandum, the government had discussed the codefendant's suicide, and at sentencing the prosecutor argued that Johnson was partly to blame "because if she [had] never had this man drop into her life, maybe she'd still be here today."

The judge addressed this subject in his sentencing remarks, describing the three women who participated in Johnson's scheme as "both victims and co-conspirators." In evaluating the sentencing factors under 18 U.S.C. § 3553(a)— particularly the nature and seriousness of Johnson's crimes—the judge described the codefendant's suicide as "a tremendous tragedy." He continued: "[S]urely[] the burden … and the publicity from the case and the other shame that she likely endured … played a role" in her death. He added that "[n]o one could conclude otherwise." The judge acknowledged, however, that Johnson "didn't have any intention of that happening," and he was "not suggesting" otherwise. Still, the judge concluded that "the nature of the offense could hardly be more serious" because of the harm to the very young children depicted in the photos, the criminal consequences for the two women who were convicted in another district as coconspirators, and the suicide of Johnson's codefendant.

Based on the egregiousness of Johnson's conduct and his prior felony conviction for aggravated sexual abuse of a minor, the judge imposed a sentence of 50 years in prison, below the life term recommended by the Sentencing Guidelines.

## II. Discussion

Johnson raises three arguments on appeal. First, he contends that either the magistrate judge or the district judge should have granted his request for new counsel. Next, he challenges the district judge's rejection of his motion for a new trial. Finally, he challenges his below-guidelines sentence on procedural grounds, arguing that the judge relied on inaccurate or unreliable evidence to make a factual finding that he caused the codefendant's suicide.

### A. Motion for New Counsel

Johnson's claim that the magistrate and district judges wrongly denied his requests for new counsel is resoundingly refuted by the record. To begin, we note that resolving attorney-client concerns in criminal cases is highly contextual and entrusted to the sound discretion of the district court. *Martel*, 565 U.S. at 663. Magistrate and district judges have broad discretion in this area given their superior position to evaluate the nature and degree of the problem and whether a change in counsel is needed. "Because a trial court's decision on substitution is so fact-specific, it deserves deference; a reviewing court may overturn it only for an abuse of discretion." *Id*. at 663–64; *see also United States v. Campos-Rivera*, 15 F.4th 826, 829 (7th Cir. 2021).

Starting with Johnson's challenge to the magistrate judge's handling of his August 2020 pro se letter, we note first that Johnson never actually requested new counsel. His letter complained about inadequate communication from his attorney and asked the court for help. The magistrate judge carefully addressed the situation, resolving it to everyone's satisfaction. First, the judge appropriately struck the pro se

letter, telling Johnson that he "could get into trouble by filing direct letters [and] … revealing some issue with [his] case that the [g]overnment would not have known." The judge also explained that because Johnson was represented, he should communicate with the court through his counsel—a well-established principle. *See United States v. Cross*, 962 F.3d 892, 899 (7th Cir. 2020) ("A defendant does not have a right to represent himself when he is also represented by counsel. A court thus has wide discretion to reject *pro se* submissions by defendants represented by counsel … ." (quotation marks omitted)).

The magistrate judge then got to the bottom of the communication concern: Tavitas explained that he had been contacted by other attorneys about possibly representing Johnson, leading him to believe that his client might be hiring new counsel. Tavitas assured the court that he and Johnson had resolved their miscommunication and were on good terms, and that his client wanted him to stay on the case. And Johnson concurred. The judge made it clear, however, that if an "irreconcilable difference" arose "for whatever reason," then he would address it and consider appointing new counsel. Because Johnson did not in fact request a new attorney and the judge appropriately addressed the nascent problem between attorney and client, the argument that the magistrate judge mishandled the pro se letter is a nonstarter.

Nor is there any support in the record for Johnson's challenge to the district judge's ruling on Tavitas's motion to withdraw and request for substitute counsel, which came a year later. Quite the opposite: the record reflects that the judge handled the motion flawlessly, citing the Supreme

Court's decision in *Martel* and carefully evaluating the relevant factors.

Our review covers the same ground: we consider "the timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint; and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's own responsibility, if any, for that conflict)." *Martel*, 565 U.S. at 663. "Reversible error occurs only when the conflict between attorney and client 'was so great that it resulted in a total lack of communication preventing an adequate defense.'" *Campos-Rivera*, 15 F.4th at 830 (quoting *Volpentesta*, 727 F.3d at 673).

The eleventh-hour motion for new counsel—filed just two days before the already much-extended trial date—was clearly untimely, as the judge held. *See, e.g.*, *United States v. Jones*, 844 F.3d 636, 642 (7th Cir. 2016) (a substitution request made three weeks before trial left "not much time to pre-pare" for trial); *United States v. Burgos*, 539 F.3d 641, 646 (7th Cir. 2008) (a request submitted on the morning of trial came too late); *United States v. Harris*, 394 F.3d 543, 552–53 (7th Cir. 2005) (same); *United States v. Huston*, 280 F.3d 1164, 1167 (7th Cir. 2002) (same); *United States v. Hall*, 35 F.3d 310, 313–14 (7th Cir. 1994) (affirming the denial of a request for new counsel filed ten days before sentencing). Untimely requests for new counsel can be "nothing more than tactics to manip-ulate or delay the trial." *Huston*, 280 F.3d at 1167 (citing *United States v. Golden*, 102 F.3d 936, 941 (7th Cir. 1996)).

Turning to the second factor, the judge's inquiry into the claimed attorney-client conflict was thorough and easily adequate under the circumstances. The motion itself was

short and almost entirely content-free, noting only that Johnson was "argumentative" in a meeting three days earlier and otherwise claiming only generally that there was "a breakdown in the attorney client relationship." The judge spent 30 to 35 minutes trying to tease out more specifics about the nature and extent of the conflict between Tavitas and Johnson. He asked questions about how frequently the two had met and whether they had communicated adequately during those meetings. He gave Tavitas and Johnson ample opportunity to explain the nature of the problem. When his initial inquiry failed to produce sufficient information, he asked follow-up questions and gave them additional time to explain. Indeed, Johnson has not meaningfully challenged the adequacy of the judge's inquiry, and we can find no shortcomings in it ourselves.

That brings us to the nature and extent of the conflict between attorney and client. Here too we see no reason to second guess the judge's determination that there was no real breakdown in communication between attorney and client. Tavitas and Johnson both confirmed that they had met multiple times in preparation for trial, reviewed the evidence, and discussed the defense strategy. Johnson protested that it wasn't enough. He said he wanted Tavitas to challenge the search warrant; he also complained that Tavitas had spent too much time talking about a possible plea deal. The judge was right to view this as a disagreement about case strategy rather than "a total breakdown in communication." *Campos-Rivera*, 15 F.4th at 830. The relationship between attorney and client may have been acrimonious at times, but that alone does not warrant substitution of counsel. *See Volpentesta*, 727 F.3d at 673–74. In short, there is no evidence of a "total lack of communication preventing an

adequate defense." *Campos-Rivera*, 15 F.4th at 830 (quoting *Volpentesta*, 727 F.3d at 673). The judge properly denied Johnson's request for new counsel.

## B. Motion for New Trial

Johnson next challenges the judge's denial of his motion for a new trial based on the belated disclosure of the FBI agents' romantic relationship. As we've noted, the motion was made orally at sentencing and was unaccompanied by any argument. Though the judge asked for the specific basis for the motion, none was forthcoming. For the sake of the record, the judge asked counsel how the new evidence would have been relevant or useful in cross-examining the agents. Tavitas replied carefully, saying only that he had given his client his considered opinion on that question, and "even after" hearing his opinion, Johnson still wanted him to make an oral motion for a new trial. There was no further elaboration. It's no surprise, then, that the judge denied the motion as undeveloped.

We could construe this unsupported motion as insufficient to preserve this issue for appeal. But the government hasn't argued waiver—probably because the motion was plainly meritless and the judge's rejection of it was manifestly correct.

The government's late disclosure of the agents' relationship arguably raises a question under the familiar principles of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution." 373 U.S. at 87. *Giglio* extended the *Brady* principle to material evidence bearing on the reliability of the testimony of a government witness. 405 U.S. at 153–54.

A successful *Brady/Giglio* claim must meet three criteria. The evidence in question (1) "must be favorable to the accused"; (2) "must have been suppressed by the government"; and (3) "must be material, that is, there must be 'a reasonable probability that the suppressed evidence would have produced a different verdict.'" *United States v. Morales*, 746 F.3d 310, 314 (7th Cir. 2014) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).

We focus on the third requirement—as the district judge did, albeit without the benefit of any argument. The likely effect of the new evidence on the outcome of the trial "must be determined in light of the full context of the weight and credibility of all evidence actually presented at trial." *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995). And because the trial judge is best positioned to assess *Brady/Giglio* evidence in full context, we review the judge's decision deferentially, reversing only if we find an abuse of discretion. *Id.* (citations omitted).

The judge was at a loss to conceive of any way in which the information about the FBI agents' romantic relationship could have been helpful to the defense in cross-examination. He therefore concluded that the new information was immaterial. We agree.

On appeal Johnson argues that the romantic relationship might have caused the agents to be distracted or to make mistakes and try to cover up each other's errors. This argu-

ment is both speculative and entirely unmoored from the trial record. The evidence of Johnson's guilt was overwhelming and included Johnson's two recorded inculpatory statements and irrefutable digital evidence from his phone, IP address, and social-media accounts tying him to the crimes. Nothing required the jury to resolve a dispute about the agents' credibility. Like the district judge, we struggle to see the relevance of the agents' romantic relationship to the investigative choices they made. The judge was well within his discretion to deny Johnson's motion for a new trial.

**C.  Sentencing Error**

Finally, Johnson argues that the judge committed procedural error at sentencing by making factual findings based on unreliable or inaccurate information—more specifically, a finding that that he was causally responsible for his codefendant's suicide. To win resentencing based on this type of procedural error, the defendant must establish both that inaccurate information was before the court and that the judge actually relied on it in making the sentencing decision. *See United States v. Campbell*, 99 F.4th 957, 960 (7th Cir. 2024); *United States v. Wood*, 31 F.4th 593, 599 (7th Cir. 2022).

Johnson's argument runs aground on the truism that "not every fact-based statement a judge makes at sentencing is a 'factual finding.'" *United States v. Orozco-Vasquez*, 469 F.3d 1101, 1107 (7th Cir. 2006). "There is a difference between formal factual findings and judicial observations that explain conclusions about sentencing factors." *Id.* at 1104. "Much of what a judge says in imposing and explaining a sentence consists of observations and assessments that form the basis of the judge's consideration of the § 3553(a) sentencing factors." *Id.* at 1107. Finally, "[j]udicial observations about

such factors as the nature and seriousness of the offense, the characteristics of the defendant, and the need to protect the public are not 'facts' requiring 'findings,' as when the judge calculates the guidelines range." *Id*. (cleaned up).

There is no dispute that Johnson's codefendant—one of the women he induced to participate in his scheme—committed suicide while awaiting trial. The judge made a common-sense observation that the burden and publicity of the case—and no doubt shame over what she had done—very likely contributed to her decision to take her own life. The judge's remarks on this subject did not amount to a factual finding that Johnson caused the suicide. They were instead a part of the judge's evaluation of the seriousness of the case in the exercise of his § 3553(a) discretion. There was no sentencing error.

AFFIRMED